**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juan Rodrigo GAMEZ–ORDUÑO, Jose Martinez–Carra, Jesus Martinez–Villa, Defendants–Appellants.**

Nos. 99–10443, 99–10445, 99–10048.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 6, 2000

Filed Dec. 14, 2000

Leslie A. Bowman, Tucson, Arizona, for defendant-appellant Gamez–Orduño; Enrique R. Gonzales, Nogales, Arizona, for defendant-appellant Martinez–Villa; Hector M. Figueroa, Tucson, Arizona, for defendant-appellant Martinez–Carra.

Robert L. Miskell, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellee.

Before: NOONAN, THOMAS, and BERZON, Circuit Judges.

Opinion by Judge BERZON; Partial Concurrence and Partial Dissent by Judge NOONAN

## OVERVIEW

BERZON, Circuit Judge:

This case arose from an encounter near the Arizona–Mexico border between the three appellants and several Border Patrol agents, leading to appellants' arrest, conviction and sentencing for marijuana trafficking and other offenses.

In February of 1998, Border Patrol agents found appellants, along with seven other men, approximately 880 pounds of marijuana, and three handguns, in a trailer near Arivaca, Arizona. Following their arrest, a grand jury returned an indictment charging appellants and the others with conspiracy to possess with intent to

distribute marijuana[1] and possession with intent to distribute marijuana.[2] The indictment also charged appellant Martinez–Villa with being a felon in possession of a firearm[3] and with using and carrying a firearm during and in relation to a drug trafficking crime.[4]

Several months later, the government filed informations asserting that appellants were subject to enhanced punishment on the drug charges due to prior drug convictions. Still later, the grand jury returned a superseding indictment against appellants, adding charges against appellants Martinez–Carra and Gamez–Orduño alleging use and carrying of a firearm during a drug trafficking crime and being felons in possession of firearms, and against all appellants for illegal re-entry after deportation.[5] After appellants entered conditional guilty pleas, the district court sentenced each appellant to concurrent terms of imprisonment for 120 months on each count and eight years of supervised release thereafter.

All three appellants now appeal the district court's denial of their motions to suppress evidence discovered in what they allege was an illegal search of the trailer. Gamez–Orduño and Martinez–Carra appeal the denial of their motions to dismiss the superseding indictment based on a claim of prosecutorial vindictiveness, grounding their vindictiveness claim on both the superseding indictment and the earlier sentence-enhancing informations. Gamez–Orduño and Martinez–Carra also appeal the district court's denial of their motion to dismiss the indictment or otherwise sanction the government because the government failed to disclose the report of a proffer session with Martinez–Villa (the "free talk"), while Martinez–Villa appeals the district court's denial of his motion to dismiss the indictment based on the gov-

ernment's alleged breach of an immunity agreement governing the free talk. Finally, Gamez–Orduño appeals the district court's calculation for sentencing purposes of the quantity of marijuana attributable to him. We reverse the district court's ruling on the suppression motion and the Gamez–Orduño sentencing calculation, affirm the remaining district court rulings, and remand.

## BACKGROUND

On the morning of February 22, 1998, Border Patrol agents found the tracks of a pack of horses heading northward near the Mexican border. Following the tracks, the agents discovered two locations where the horses' riders had dismounted, eaten and rested. At one of the rest stops, the agents found a torn scrap of vinyl. The agents eventually followed the tracks directly to the front door of a trailer, where they found fresh horse droppings on the patio and a piece of vinyl tarp that matched the scrap they had discovered on the trail. The agents arrived at the trailer at around 2:00 p.m.

The agents heard voices coming from the trailer. Through the screen door an agent saw a man trying to hide. Concerned about the agents' safety, one agent opened the unlatched door. Inside the trailer, the agents found ten men, one of whom was trying to hide in the shower, and discovered Martinez–Villa sleeping on a fully-loaded handgun. The Border Patrol agents found 399.26 kilograms (approximately 880 pounds) of marijuana, and two handguns wrapped in some clothes. In addition to the guns and drugs, the agents seized two horses and a mule from outside the trailer and a heavy-duty scale from inside.[6] All ten of the men found in

1. 21 U.S.C. § 846.

2. 21 U.S.C. § 841(a)(1).

3. 18 U.S.C. § 922(g).

4. 18 U.S.C. § 924(c).

5. 8 U.S.C. § 1326.

6. Some of these background facts are taken from the Presentence Report ("PSR"). On remand, of course, the district court is not bound by this recitation, but is free to make

the trailer were eventually indicted on charges related to the transport of the marijuana.

Appellants' testimony at the November 30, 1998 suppression hearing as to how they got to the trailer was as follows: On February 21, 1998, Gamez–Orduño and Martinez–Carra, along with other men arrested at the trailer who are not party to this appeal, were lost in the desert with a "load" of marijuana. A man named "Oscar" located them and transported them, lying down in the bed of a pickup truck, to a ranch in Arivaca. Oscar used a key from a key ring that also had the truck's ignition key on it to unlock the gate located at the entrance of the ranch, and drove through the gate to the trailer. He then unlocked the door to the trailer with a key from the same key ring, reached inside the trailer without looking, flipped on the light switch, and invited the smugglers in.

The trailer was owned by one Mary Ann Carrillo, Oscar's mother, and appeared to be someone's home. Oscar, who lived on his mother's property, provided the smugglers with food, sleeping bags and a place to sleep. Before Oscar left to get food, he told the men to stay in the trailer and not to "go out at all." All ten then spent the night in the trailer. Gamez–Orduño believed that Oscar had authority to allow him into the trailer because of Oscar's familiarity with the premises and his instruction to the men to stay in the trailer.

Initially, both Gamez–Orduño and Martinez–Villa testified that they were in the trailer awaiting a ride to Tucson, where they hoped to find work. On cross-examination, however, Martinez–Villa admitted that he had been approached at his house in Nogales, Mexico, and offered $500 to find and guide a lost group of marijuana backpackers to the trailer. He then related that he left Mexico on horseback, found the backpackers, and guided them to the trailer; that he knew Mary Ann Carrillo because he had formerly worked at a neighboring ranch and had had one conversation with her then, when he was looking for some of her livestock; that that one conversation was the extent of his prior relationship with Mary Ann Carrillo; and that he had no prior relationship at all with Oscar Carrillo. Martinez–Villa stayed at the Carrillo ranch the night of February 22, he testified, "because I was tired and they gave me a break to be able to stay there."

The government's questions about Martinez–Villa's role in the smuggling enterprise, it was revealed at the suppression hearing, were based on a previously undisclosed report summarizing the free talk session with Martinez–Villa. The district court ordered the report disclosed after reviewing it *in camera,* noting that the report directly contradicted the government's previous position that neither Mary Ann Carrillo nor her son Oscar was involved in the drug trafficking or had any connection to the appellants, and that the appellants were trespassers in the trailer. Indeed, the court found, the report detailed the Carrillos' significant involvement in the drug operation at their ranch. The court deemed the report a material nondisclosure violating *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and required the government to disclose it. Because of the serious nature of the charges against appellants, the district court reluctantly decided not to grant any remedy beyond ordering disclosure and continuing the hearing to permit appellants the opportunity to consider the report and determine how to respond.

## DISCUSSION

### I. "Standing" to Challenge Search and Seizure [All Appellants]

The district court did not determine whether the warrantless search of the trailer was reasonable under the Fourth Amendment because it found that the appellants lacked Fourth Amendment

factual findings based on the evidentiary rec-

ord developed on the motion to suppress.

"standing"—that is, that appellants' own Fourth Amendment rights were not violated. Appellants challenge this conclusion, maintaining that, as overnight guests of the Carrillos, they had a sufficient expectation of privacy in the trailer to be entitled to Fourth Amendment protection. We agree.

### A. *Fourth Amendment Protection Of Overnight Guests*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" U.S. Const. amend. IV. Because the Fourth Amendment protects "people, not places," *see Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), a person claiming a Fourth Amendment violation must, as an initial matter, demonstrate a "legitimate expectation of privacy" in the place searched or the thing seized. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A person's expectation of privacy is deemed legitimate if it is "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring); *see also Rakas*, 439 U.S. at 143–44, 99 S.Ct. 421 (concluding that an expectation is reasonable if it derives from "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society").[7]

Whether or not he can show indices of residency (such as keys to the premises or the ability to come and go and admit or exclude others), an overnight guest in another's home has a reasonable expectation of privacy for purposes of Fourth Amendment standing. *Minnesota v. Olson*, 495 U.S. 91, 96, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *id.* at 96 n. 4, 110 S.Ct. 1684 ("We need go no further than to conclude, as we do, that Olson's status as an overnight guest is *alone enough* to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.") (emphasis added). As the Court in *Olson* explained:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society.... [W]e think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.
>
> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside.

*Id.* at 98–99, 110 S.Ct. 1684.

An individual whose presence on another's premises is purely commercial in nature, on the other hand, has no legitimate expectation of privacy in that location. *See Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). In *Carter*, the Court held that two drug dealers did not have a legitimate expectation of privacy in an apartment, already set up for drug manufacturing, that the defendants occupied only for two-and-one-half hours and only for the purpose of packaging drugs for resale, and for the use of which they "paid" the lessee an eighth of an ounce of cocaine. *Id.* at 86, 91, 119 S.Ct. 469. Because they were present solely "for a business transaction,"

---

7. Although courts continue to discuss whether a criminal defendant has a legitimate expectation of privacy under the rubric of "standing," *see, e.g., United States v. Armenta*, 69 F.3d 304, 308 (9th Cir.1995), the issue is analytically not one of standing in the Article III sense but rather purely one of Fourth Amendment doctrine. *See Rakas*, 439 U.S. at 138–40, 99 S.Ct. 421.

*id.* at 90, 119 S.Ct. 469, the defendants in that case had no legitimate expectation of privacy. The Court contrasted their situation with that of the defendant in *Jones v. United States,* 362 U.S. 257, 259, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), who "had slept [in the apartment] 'maybe a night,'" and who did have a legitimate expectation of privacy. 525 U.S. at 89–90, 119 S.Ct. 469; *see also id.* at 90, 119 S.Ct. 469 ("Thus an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.").[8] The *Carter* Court concluded that the "purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between [the defendants] and the householder," made the defendants' situation more akin to that of someone who was merely "legitimately on the premises" than that of an overnight guest. *Id.* at 93, 119 S.Ct. 469.

### B. *Application of* Carter *and* Olson *to this Case*

■ The pivotal question, then, is whether the situation of the appellants in this case was akin to that of the overnight guests in *Olson* or, instead, as the district court held, analogous for Fourth Amendment "standing" purposes to that of the defendants in *Carter.* The district court found that "each of [the appellants] were backpackers *staying at the residence for food and rest*" with the permission of at least Oscar Carrillo, and possibly Mary Ann as well. That conclusion is fully supported by the evidence. For example, Gamez–Orduño testified that Oscar Carrillo provided appellants with sleeping bags and food and that the trailer was equipped with a refrigerator, a stove, water, and a

television. Moreover, appellants testified, and the government does not dispute, that appellants slept in the trailer the night preceding the Border Patrol's arrival. We therefore affirm the district court's factual findings. *See United States v. Armenta,* 69 F.3d 304, 307 (9th Cir.1995) (holding that district court's factual findings on Fourth Amendment standing issue are reviewable only for clear error).

Despite its finding that appellants stayed overnight in the trailer with the Carrillos' permission, the district court saw appellants' situation as similar to that of the defendants in *Carter.* Stressing that appellants came to the trailer in the course of their drug smuggling activities, the district court held that they were there "for a purely commercial purpose, that is, to rest in the course of bringing drugs, transporting drugs," and thus could not establish Fourth Amendment standing. This holding, reviewable *de novo, see United States v. Sarkisian,* 197 F.3d 966, 986 (9th Cir. 1999), was erroneous.

■ The record shows that appellants were overnight guests in the trailer, and that they were there for rest and food, not "simply ... to do business." *Carter,* 525 U.S. at 90, 119 S.Ct. 469. Resting overnight in a home made available without charge by an identifiable occupant is not commercial activity. And this is true no matter why the guests are away from home and in need of shelter, and no matter whether the relationship between the host and the guests is a social or a business one.

The district court's holding to the contrary turned on the court's finding that appellants "weren't social guests, ... friends or acquaintances of the owners of the premises," and reflected the under-

---

8. While overnight guest status is sufficient for Fourth Amendment protection, it may not be necessary. As a leading treatise has recently commented, the several opinions in *Carter* add up to a "different majority ... [that] actually embraced the position that a social guest would not have to be an overnight guest in order to have standing in the premises of another." 5 Wayne R. LaFave, *Search and Seizure* § 11.3, at 15 (3d ed. Supp.2000) (citing Justice Kennedy's concurrence, Justice Breyer's concurrence in the judgment, and the dissent of Justices Ginsburg, Stevens and Souter).

standing that, under *Carter*, a social purpose for an overnight stay is a necessary precondition of forming a legitimate expectation of privacy. But *Carter* neither suggests that the Fourth Amendment's regard for overnight guests depends on whether the visit is purely social in nature nor undermines *Olson*'s explicit holding that "status as an overnight guest is alone enough to show that [the guest] had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson*, 495 U.S. at 96–97, 110 S.Ct. 1684.

Indeed, there is no reason why the nature of the relationship between host and guest should affect the overnight guest's expectation of privacy. A businessman who stays at the home of a business acquaintance when he comes to town for no other purpose than to conclude a deal is still an overnight guest, not engaged in "purely commercial" activity while at the home, and has an expectation of privacy while there. *See id.* at 98, 110 S.Ct. 1684 (noting that "we stay in others' homes when we travel to a strange city for business or pleasure").

The dissent accepts this proposition but maintains that this case is different from the one hypothesized because the relationship between the appellants and the Carrillos had no "suggestion of friendly hospitality." Post, at 466. It is doubtful, though, that Rob Olson's hosts in *Minnesota v. Olson* were motivated by "friendly hospitality" when they allowed him to spend the night on the floor of their home after he drove the get-away car in an armed robbery, a fact which they apparently knew, and then lied to the police about whether Olson was in the house or not. 495 U.S. at 93–94, 97 n. 1, 110 S.Ct. 1684. Nor does *Olson* suggest that the relevant focus is on the motivation of the hosts in permitting an overnight stay. Rather, *Olson*, understandably, views the expectation of privacy question "[f]rom the overnight guest's perspective," 495 U.S. at 99, 110 S.Ct. 1684, and focuses on the innately private nature of the personal activities for which one seeks overnight shelter:

> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep, because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth—a temporarily private place whose momentary occupant's expectations of freedom from intrusion are recognized as reasonable....

*Id.* (citation omitted) (emphasis added).

The trailer the appellants stayed in was set up as a dwelling place, and, the district court found, the appellants were using it for their private, personal needs, not, as in *Carter*, as a location for packaging drugs or otherwise engaging in their criminal activity. Whether the appellants were likely to continue their smuggling activities the next day, or were admonished to stay inside to avoid detection, is as irrelevant as whether Rob Olson was likely to "leave town by bus" the next day to avoid arrest, or was "found ... hiding in a closet," presumably also to avoid detection. 495 U.S. at 93, 94, 110 S.Ct. 1684. In both cases, the pertinent fact for purposes of judging the privacy expectation is that appellants were engaging in the necessary, intimate activities of daily life while staying in a dwelling provided by someone else, activities ordinarily conducted in secure, enclosed spaces and which our society regards as private.

Moreover, to say of the appellants that "[i]n the trailer, as outside it, they were

the carriers of forbidden merchandise," and that "[t]he only expectation that they could have had was to be arrested if they were discovered," post, at 466, is not to distinguish them from individuals staying in their *own* houses—or house trailers—for rest while engaged in a several-day course of criminal activity. In either case, the Fourth Amendment does not protect the criminal from arrest, whether in his own home or in a dwelling provided by another, but does assure that the government must comply with constitutional limitations before coming into a private living space.

The government argues to the contrary, maintaining that *Armenta*, 69 F.3d at 304, supports the district court's holding. *Armenta*, however, does not suggest that actual overnight guests in a residence may lack a reasonable expectation of privacy. In *Armenta*, we merely affirmed a finding that the appellant in that case had not established that he was in fact an overnight guest of an identifiable host, noting that the defendant's "situation [was] vastly different from that of 'overnight guests' who do have legitimate expectations of privacy in their hosts' homes." *Id.* at 308; *see also id.* at 309 n. 3 (determining that there was no evidence that Armenta's co-conspirator owned, rented, or had authority to use the premises or to invite Armenta to do so). In contrast, the district court here found that appellants had an identifiable host, Oscar Carillo, and that "in fact, [appellants] were [in the trailer] with the permission of the Carrillos."

In short, the district court's findings of fact establish that, as a matter of law, appellants were overnight guests of Oscar Carillo, and, as such, had a legitimate expectation of privacy in the trailer while staying there "for food and rest." We therefore reverse the district court's ruling on the motion to suppress and remand so that appellants may contest the Border Patrol's search and seizure on substantive Fourth Amendment grounds.

## II. Alleged *Brady* Violation [Gamez–Orduño and Martinez–Carra]

Gamez–Orduño and Martinez–Carra argue that the government's failure to disclose the report of the government's free talk session with Martinez–Villa before the suppression hearing violated their due process rights. Before Martinez–Villa testified at the suppression hearing, the government had argued, in its briefs and orally at the suppression hearing, that appellants lacked Fourth Amendment standing because they were trespassers in the trailer with no connection to the Carrillos. The government's cross-examination of Martinez–Villa, however, led counsel for the other two appellants to suspect—correctly—that the government had an unrevealed source of information about the smugglers' activities before and during their stay at the trailer. Upon inquiry, the district court discovered that this was indeed the case, ordered the government to turn over the free talk report, and continued the hearing in order to give appellants time to absorb the report and determine how to respond.

 The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215; *United States v. Barton*, 995 F.2d 931, 933–34 (9th Cir.1993). Such a due process violation may be cured, however, by belated disclosure of evidence, so long as the disclosure occurs " 'at a time when disclosure would be of value to the accused.' " *United States v. Span*, 970 F.2d 573, 583 (9th Cir.1992) (quoting *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir.1988)).

 The district court recognized that the free talk report was material in that it supported appellants' assertion that they had been present at the trailer as guests of Oscar Carillo, and thereby served to dis-

prove the government's trespass-based standing argument. By withholding the report while making factual representations inconsistent with it, the government violated due process by "depriving [appellants] of liberty through a deliberate deception of court and jury ... [which is] as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Brady*, 373 U.S. at 86, 83 S.Ct. 1194. The district court therefore properly held that the prosecutor's conduct was "a serious violation" of appellants' due process rights.

The district court, despite this finding, denied appellants' request to sanction the government by dismissing either the indictment or the conspiracy count, finding so "drastic an action ... [in]appropriate under the circumstances." The court did, however, grant a two-month continuance, affording appellants ample time to prepare anew for the suppression hearing.

Because of the continuance, disclosure ultimately "occurred at a time when it [was] of value to the accused." *Span*, 970 F.2d at 583. Indeed, the district court's findings of fact essentially adopted the free talk report's version of events in determining the facts surrounding appellants' presence in the trailer. Under these circumstances, the government's actions could not have affected the outcome of the hearing, and appellants' due process rights were adequately protected. *See United States v. Woodley*, 9 F.3d 774, 777 (9th Cir.1993). We therefore affirm the district court's refusal further to sanction, by dismissal of the indictment or of the conspiracy count, the government's conduct.

## III. Prosecutorial Vindictiveness [All Appellants]

Appellants claim that after they indicated that they would reject the government's offer of a plea and proceed to trial, the prosecutor vindictively filed informations alleging that they were subject to increased sentences because of their prior drug convictions. Appellants also claim that the prosecutor vindictively sought a superseding indictment adding additional charges in response to their motions to suppress. The district court rejected appellants' vindictiveness claims.[9]

 A prosecutor violates due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). Vindictiveness claims are, however, evaluated differently when the additional charges are added during pretrial proceedings, particularly when plea negotiations are ongoing, than when they are added during or after trial. *See United States v. Goodwin*, 457 U.S. 368, 380–81, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); *United States v. Gallegos–Curiel*, 681 F.2d 1164, 1167 (9th Cir. 1982). Although "prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights" violates due process in the pretrial setting as it does at other stages, *Gallegos–Curiel*, 681 F.2d at 1169, in the context of pretrial plea negotiations vindictiveness will not be presumed simply from the fact that a more severe charge followed on, or even resulted from, the defendant's exercise of a right. *See id.* at 1168.

 The reason that we do not presume vindictiveness in the pretrial plea bargaining situation flows from the courts' sanctioning of plea negotiations as a means of resolving criminal cases. The Supreme

---

9. The standard of review for a claim of vindictive prosecution is still open to question in the Ninth Circuit. This court has expressly left open (as recently as June 1999, *see United States v. Frega*, 179 F.3d 793, 801 (9th Cir. 1999)) the question of what standard governs such a claim: *de novo*, clear error, or abuse of discretion. Because appellants' claims of prosecutorial vindictiveness fail under any of these standards, we have no occasion to resolve the standard of review issue.

Court, and this court, have recognized that prosecutors will often, as a plea negotiation tactic, threaten increased charges during the course of plea negotiations, and later, if no guilty plea is forthcoming, make good on that threat. Recognizing that such prosecutorial conduct is not meaningfully distinguishable from charging more strictly at the outset and then reducing the charges as a result of plea negotiations, the courts have concluded that threatening and then filing more severe charges as an outgrowth of plea negotiations does not violate due process. *See Bordenkircher,* 434 U.S. at 363–64, 98 S.Ct. 663; *United States v. Noushfar,* 78 F.3d 1442, 1446 (9th Cir.1996).

▇▇▇▇ Here, the prosecutor's actions in filing the sentence-enhancing informations and in seeking the superseding indictment took place during ongoing plea negotiations. After the government learned of appellants' prior records it withdrew its original plea offer on June 28, 1998. Ten days later, the government offered a revised plea in a letter that also notified appellants that the informations would be filed the next day. The informations were based on appellants' prior convictions, of which the prosecutor had no knowledge at the time the original indictment was filed. "When increased charges are filed in the routine course of prosecutorial review or as a result of continuing investigation there is no realistic likelihood of prosecutorial abuse, and therefore no appearance of vindictive prosecution arises merely because the prosecutor's action was taken after a defense right was exercised." *Gallegos–Curiel,* 681 F.2d at 1169.

▇▇▇ As for the superseding indictment, appellants ask us to infer vindictiveness from the fact that the government sought the second indictment only after appellants filed their motions to suppress and indicated their intention to proceed to trial. Again, these events took place in the context of plea negotiations, and the increased charges were themselves the subject of negotiations between the parties: The rec-

ord reveals that, prior to appellants' filing of their motions to suppress, the prosecutor indicated by letter her intention to seek the superseding indictment, as well as her willingness to refrain from doing so in exchange for a guilty plea on the conspiracy charge. Thus, the fact that the superseding indictment followed closely on appellants' indication that they would pursue their motions to suppress, without more, raises no presumption of vindictiveness. *See Noushfar,* 78 F.3d at 1446.

Moreover, the timing of the superseding indictment is adequately explained by the delays inherent in the plea negotiation process. At a hearing two months after the prosecutor's second plea offer letter, the prosecutor indicated to the district court that she would seek the superseding indictment before trial; at that same hearing, it was disclosed that negotiations on that plea offer were still ongoing at that point with at least one defendant, adequately explaining the belated filing of the superseding indictment, which covered all three appellants (as did the original indictment).

In short, on this record, our cases leave no room for appellants' contention that we may presume vindictiveness either from the prosecutor's explicit linkage of the increased charges with appellants' refusal to plead guilty, *see Bordenkircher,* 434 U.S. at 363–64, 98 S.Ct. 663, or from the fact that the superseding indictment was filed shortly after appellants filed their motions to suppress, *see Noushfar,* 78 F.3d at 1446 (holding that without more, allegations that additional "charges were filed because the defendants had moved to suppress evidence [are] ... insufficient to create a presumption of vindictiveness"). The judgment of the district court on this point was correct under any standard of review.

## IV. Marijuana Quantity Calculation for Sentencing [Gamez–Orduño]

Gamez–Orduño next challenges the district court's ruling that, for sentencing

purposes, he was responsible for all the marijuana found in the trailer.

Gamez–Orduño pled guilty to conspiracy to possess marijuana with intent to distribute it, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. The district court determined that the offenses to which Gamez–Orduño pled guilty involved over 100 kilograms of marijuana, and that Gamez–Orduño had previously been convicted of a drug felony. Therefore, Gamez–Orduño faced a statutory minimum sentence of ten years. *See* 21 U.S.C. § 841(b)(1)(B).

■ In determining the quantity of marijuana for which Gamez–Orduño was responsible for sentencing purposes, the district court was required to "assess [the] defendant's individual ... level of responsibility for the amount of drugs involved in [the] offense by determining, in accord with the [Sentencing] Guidelines, the amount that the defendant could reasonably foresee ... would be involved in the offense of which he was guilty." *United States v. Nunez–Carreon*, 47 F.3d 995, 999 (9th Cir.1995). Where, as here, the defendant is charged with "jointly undertaken criminal activity," U.S.S.G. § 1B1.3(a)(1)(B), a "defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 cmt. n. 1; *see also United States v. Palafox–Mazon*, 198 F.3d 1182, 1186 (9th Cir.2000).

■ The PSR's calculation for Gamez–Orduño's base offense level merely says "[p]er § 1B1.3(a)(1)(B), the defendant is accountable for the 399.26 kilograms of marijuana seized. The guideline for this violation of 21 U.S.C. §§ 841(a)(1) and 846 is § 2D1.1(c)(7)." PSR at 5. Thus, the PSR cited the appropriate guideline for jointly undertaken criminal activity, but did not state *why* Gamez–Orduño was ac-

countable for the full amount of marijuana seized in the trailer. In particular, although there is evidence in the record that may suggest that appellants "coordinate[d] their importation efforts by walking across the border together for mutual assistance and protection," U.S.S.G. § 1B1.3(a)(1)(B) cmt. n. 2(c)(8), the PSR does not make any such finding. Nor does the PSR state that smuggling marijuana in excess of 800 pounds was a reasonably foreseeable outcome of Gamez–Orduño's joint efforts with his co-defendants.

■ Even though the PSR's finding on the quantity of drugs for which Gamez–Orduño was accountable amounted only to "conclusory statements," *United States v. Becerra*, 992 F.2d 960, 966 (9th Cir.1993), the district court simply adopted the "facts as set forth in the [PSR], as to the accountability of each defendant for the total quantity of drugs ... that were present," and on that basis accepted the PSR's calculation of the base offense level. By doing so, the district court erred. For, while "the sentencing court may adopt the factual findings of the presentence report," a district court "may not adopt ... conclusory statements unsupported by the facts or the Guidelines." *Becerra*, 992 F.2d at 966; *accord United States v. Navarro*, 979 F.2d 786, 788 (9th Cir.1992).

It was therefore improper to hold Gamez–Orduño responsible for the full amount of marijuana in the trailer without an explicit finding as to what amount he could reasonably foresee "would be involved in the offense of which he [pled] guilty." *Nunez–Carreon*, 47 F.3d at 999. We remand to the district court to make appropriate findings on this question, and to reconsider the appropriate offense level based on those findings.

## V. Breach of Immunity Agreement [Martinez–Villa]

■ Martinez–Villa contends that the government breached the immunity agreement it reached with him governing the free talk session he had on August 11, 1998

with the government. Specifically, he claims that the government breached the agreement when it cross-examined him at the motions hearing held on December 1, 1998, and when it disclosed the existence of the free talk report without giving him prior notice.

Both of these claims are belied by the agreement itself, in particular paragraph 2, which provides:

(2) *Except as otherwise provided in paragraphs three, four and five* herein, in the above-captioned case and in any prosecution that may be brought against your client by this office, *the government will not offer as evidence in its case-in-chief, or in connection with any sentencing proceeding* for the purpose of determining the appropriate sentence, *any statements made by your client at the meeting.*

SER 1 (emphasis added). At the motions hearing, the government used the information from the free talk to formulate questions for its cross-examination of Martinez–Villa. Such use did not violate paragraph 2, as it was neither part of the government's case-in-chief nor in connection with sentencing.

Martinez–Villa argues, however, that the government's disclosure of the free talk without prior notice violated paragraph 5 of the agreement. That paragraph provides that:

... [I]f the government should ever conclude that your client has knowingly withheld information from the government or otherwise not been completely truthful and candid, the government may use against your client *for any purpose* (including sentencing) any statements made or other information provided by you or your client during the meeting. If the government so concludes, it will notify you before making any use of such statements or other information....

SER 2 (emphasis added). Paragraph 5, however, is most sensibly understood as an *exception* to the prohibitions enumerated in paragraph 2 if Martinez–Villa is not "truthful and candid," not as an additional notice requirement applicable even when the agreement would otherwise allow government use of the free talk. Accordingly, considering the issue *de novo, United States v. Dudden,* 65 F.3d 1461, 1467 (9th Cir.1995), we conclude that the government was not required under paragraph 5 to give Martinez–Villa notice that it intended to use his statements during the suppression hearing. The district court did not err in determining that there was no violation of the immunity agreement.

## CONCLUSION

The district court's ruling that appellants lacked standing to assert their Fourth Amendment claims is reversed, as is the district court's sentencing decision with respect to appellant Gamez–Orduño, and the case is remanded for further proceedings on the motion to suppress and, if necessary, on Gamez–Orduño's sentence. In all other respects, the judgment of the district court is affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION**

NOONAN, Circuit Judge, concurring and dissenting:

I concur in the opinion of the court except as to its holding that Gamez–Orduño and his companions may claim the protection of the Fourth Amendment.

The extension of the Fourth Amendment to overnight visitors reasonably fortifies the right of persons to be secure in their dwellings. The extension embraces those overnight visitors who are the homeowner's guests. *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Gamez–Orduño testified that he and Martinez–Carra and seven others arrived at the trailer "lying down on the bed in the back" of a pick-up truck driven by a man he did not know. That is not the way

guests customarily arrive. Once at the trailer, the backpackers were not told "to make themselves at home." Instead, they were instructed not to move about and "not to go out at all." A person under such restrictive orders does not qualify as a guest in any sense of that fairly specific term, except in the obsolete sense of guest meaning "stranger."

These backpackers were on business when they stopped overnight at the trailer controlled by their confederates. The term "houseguest or overnight guest," with the suggestion of friendly hospitality, does not fit them. Neither Oscar nor his absent mother treated these men as persons with the special regard that guests customarily receive. No "longstanding social custom" supports putting up a crowd of men, known at most as mules in the criminal business conducted by their hosts. No "functions recognized as valuable by society" were performed by giving the drugs carriers a safe house as they carried their drugs.

Nor were the defendants like a businessman in town to do a deal who is put up overnight by an associate. In such a case there is an element of sociability in the accommodation offered and accepted. The guest could have stayed in a hotel; it is a bit of hospitality to take him or her into a home. Here hospitality was not the aim. The trailer provided the necessities of the criminal trip—food and rest so that the refreshed conspirators could continue on to market their wares.

The district court did not err in its factual finding that the travelers were in the trailer "for a purely commercial purpose." The district court did not err in its legal conclusion that they had no legitimate expectation of privacy recognized by society. The business of these men was to carry marijuana into the United States; that they paused in their journey to gain strength did not mean that they gave up their task. In the trailer, as outside it, they were the carriers of forbidden merchandise. The only expectation that they could have had was to be arrested if they were discovered. That expectation, which was also the expectation of our society, was realized when the Border Patrol arrived.