[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13261
Non-Argument Calendar
_____

D.C. Docket Nos. 3:12-cv-00881-MMH-MCR, 3:09-cr-00051-MMH-MCR-1


FREDRICK CAMPBELL,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 4, 2018)

Before ED CARNES, Chief Judge, HULL, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Fredrick Campbell, a federal prisoner proceeding pro se, appeals the district court's dismissal of his 28 U.S.C. § 2255 motion alleging ineffective assistance of counsel. A jury found Campbell guilty of drug and firearms offenses and he was sentenced to 195 months in prison. We affirmed his convictions and sentence on direct appeal. Campbell then filed this § 2255 motion, contending that his pretrial counsel rendered ineffective assistance in investigating and litigating his motion to suppress evidence. The district court denied Campbell's § 2255 motion without an evidentiary hearing on the grounds that Campbell could not establish deficient performance or prejudice. This is his appeal.

## I.    FACTS AND PROCEDURAL HISTORY

### A. Facts

In late 2008, Detectives Richard Hughey and Charles Bates of the Jacksonville Sheriff's Office received a tip from a confidential informant that Campbell was using United Parcel Service and Federal Express to ship marijuana to Jacksonville. The detectives used computer databases to identify several addresses associated with Campbell, one of which was 7635 Praver Drive East in Jacksonville. Detective Hughey contacted William Brown, a UPS employee, and told Brown to notify him if UPS received any packages designated for the addresses associated with Campbell.

2

In January 2009, a UPS driver told Brown that he had a package addressed for a "Maureen Lawrence" at the Praver house. Brown took the package to his office, opened it, and found that it contained marijuana.[1] Brown contacted Detective Hughey, and he and Detective Bates arrived at the UPS facility shortly thereafter to inspect the package. The detectives saw the marijuana sitting in the open package, determined that it was in fact marijuana, resealed the package, and decided to make a controlled delivery of the package. The detectives also obtained an anticipatory search warrant to execute after successful delivery of the package.

Police officers set up surveillance around the Praver house before making the controlled delivery. Detective Hughey observed a man, later identified as Campbell's brother, Alex, drive up to the house, pull into the garage, and close it. About five minutes later he opened the garage and drove off. A few minutes after Alex left, another vehicle arrived at the house and the passenger, who the police identified as Campbell, got out. The vehicle drove off, and a detective dressed in plainclothes walked up to Campbell in the front yard of the house to give him the package. Campbell stated that the package might belong to a sibling with the last name of Lawrence, but accepted the package and then put it inside the garage. He then closed the garage door from the outside, knocked on the front door, and an

---

[1] UPS prohibits the shipment of illegal drugs, and it also reserves the right to open and inspect any package that it ships. Brown testified that he opened the package to determine whether it contained any contraband.

individual later identified as Tamario Wiley opened the front door and let Campbell inside. A few minutes later, Alex returned to the house, drove his vehicle inside the garage, and closed the garage door from the inside.

The officers executed the search warrant about ten minutes later. They found the UPS package in a car parked in the garage; that car also contained another 50-pound package of marijuana. As the officers searched the house for marijuana, they found a number of other incriminating items: four firearms, including an assault rifle with a 100-round magazine; a laptop with an open screen displaying a UPS tracking number; a money counter; several thousand dollars in cash; a lease agreement naming Alex as the lessee of the Praver house; lease agreements for other houses; and storage unit rental agreements.

The police arrested Campbell and his brother. When police asked Campbell where he lived, he initially gave the P.O. Box listed on his driver's license, but then identified the Praver house as his residence. The police searched Campbell and found over $5,000 in cash and a small amount of marijuana on his person.

The police used the documents from the Praver house to obtain search warrants for storage unit 226 at Atlantic Self-Storage and a house located at 4708 Trevi Drive in Jacksonville. Police found over $500,000 in cash at the storage unit. At the Trevi house, police found money grams; hotel, car rental, and airline receipts; various notes containing addresses, phone numbers, and tracking

4

numbers; and storage unit rental agreements. Those rental agreements led the police to conduct more authorized searches at other storage units, one of which (storage unit 2002) contained an assault rifle and boxes of shipping receipts connected to marijuana shipments.

## B. Procedural History

A grand jury indicted Campbell, Alex, his mother, and his sister with conspiracy to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. Campbell and his brother were also charged with possessing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Campbell filed a motion to suppress the evidence obtained from Brown's search of the package at the UPS facility, the officers' search of the Praver house, and the search of storage unit 2002. He also sought to exclude evidence taken from storage unit 226 and the Trevi house as fruits of the poisonous tree. As relevant here, the government argued that Campbell did not have standing to challenge the Praver house search because he did not have a legitimate expectation of privacy in that house.

The magistrate judge held a hearing in August 2009 and the government called Detective Hughey, Detective Bates, and Brown (the UPS employee).

Campbell's pre-trial counsel, Ross Haine, did not call any witnesses, and instead relied on cross-examination to attempt to show that Campbell had a legitimate expectation of privacy at the Praver house. At the end of the hearing, Haine argued that Campbell had established standing to challenge the search of the Praver house because computer searches revealed that Campbell was associated with the Praver house and Campbell had given the Praver house as his address when he was arrested. According to Haine, those facts showed that Campbell was more than a mere visitor at the Praver house and that he had a legitimate expectation of privacy in it.

The magistrate judge issued a report recommending that Campbell's motion be denied, finding that he did not have a legitimate expectation of privacy in the Praver house. The magistrate judge also found that the officers exceeded the scope of their authority when they seized the storage unit agreement documents from the Praver house, which led them to obtain search warrants for the storage units. But the magistrate judge found that Campbell could not challenge the evidence obtained from the storage units as fruits of the poisonous tree because he did not have standing to challenge the Praver house search. The district court adopted the magistrate judge's recommendation and denied Campbell's motion to suppress.

Campbell proceeded to a jury trial in February 2010. Campbell testified in his own defense. He admitted that he had marijuana shipped from California to

Jacksonville and sold it, but denied that any of his family members were involved in the operation. He also denied ever renting or residing in the Praver house. The jury found Campbell guilty on all three charges.[2] At the sentence hearing, the district court found that Campbell committed perjury because he had lied under oath about his family's involvement in the marijuana operation, the amount of marijuana he was trafficking, and other pieces of evidence. He received a 195-month prison sentence.

Campbell appealed his convictions and sentence, which we affirmed. United States v. Campbell, 434 F. App'x 805 (11th Cir. 2011) (unpublished). As relevant here, we rejected his claim that he had standing to challenge the search of the Praver house. Id. at 809. We stated that Campbell testified at trial that he did not live in the house and the evidence from the suppression hearing showed that he did not lease the house. Id. at 810. Because those facts "did not establish that he was more than a mere guest at the Praver house," we held that he did not have standing to challenge the search of that house. Id.

C.    Campbell's § 2255 Motion

Campbell filed this pro se § 2255 motion in August 2012. He raised an ineffective assistance of counsel claim against Haine, his pretrial counsel who handled the motion to suppress. He alleged that Haine rendered ineffective

---

[2] The jury found Alex guilty on all three charges. Campbell's mother and sister pleaded guilty.

7

assistance by failing to consult with Campbell, failing to investigate Campbell's ties with the Praver house, and by failing to call Campbell and other witnesses at the suppression hearing. According to Campbell, if Haine had called him and the other witnesses then he could have established that Campbell had a reasonable expectation of privacy in the Praver house.

Campbell attached a number of sworn affidavits to his § 2255 motion that he relied on to support his ineffective assistance claim. In one affidavit, Campbell stated that he had met with Haine on multiple occasions before the suppression hearing and that the two discussed potential defenses. Campbell told Haine that he wanted Haine to file a motion to suppress, and that Haine did so and provided Campbell with a copy. But according to Campbell, Haine did not explain what "standing" was after the government filed its response; Haine told Campbell not to worry about that because Campbell had provided the Praver house as his residence when he was arrested. When Campbell told Haine that Campbell did not live at the house, Haine replied that it "wouldn't be a good idea to tell the government you didn't live at the Praver home, because if I were to say you didn't stay at the home, you wouldn't have standing to challenge the search." Campbell also stated in the affidavit that Haine did not interview him about his connection to the home and that when Campbell explained that he wanted to testify, Haine replied that it would not be a good idea because the government would trip him up. Campbell's

8

friend, Tamario Wiley, also submitted an affidavit describing his meeting with Haine.

As for the other affidavits, Campbell submitted one in which he described his connection to the Praver house. He stated that he was a regular guest at the house and went there almost every day, even without an invitation. He stated that he had been present at the home when no one was there, slept there on multiple occasions — including the night before his arrest — and would go to the house to play video games, listen to music, and hang out with his brother Alex and their friends. He also stated that he kept personal items at the Praver house, such as clothes, his computer, and papers. Campbell admitted that he did not have a key to the Praver house but if he wanted to visit when no one was there Alex or Wiley would leave a door unlocked or he would borrow their keys. Finally, Campbell denied meeting anyone at the Praver home to sell drugs, but admitted to having marijuana sent to the home on two occasions (including the delivery in this case). Campbell also submitted affidavits from Alex, Wiley, and three friends who visited the home. Those five people confirmed that Campbell often visited the Praver house to hang out.

The district court denied Campbell's motion without an evidentiary hearing. It found that a hearing was not necessary because, accepting the facts in Campbell's affidavits as true, he could not succeed on his ineffective assistance

claim.  For deficient performance, the court found that Haine adequately investigated the case and made a reasonable decision not to call Campbell because the government could have used Campbell's testimony at trial for impeachment purposes.  As for prejudice, the court found that Campbell could not state a meritorious Fourth Amendment claim because the evidence did not establish that he had an unrestricted right of access to the house or that he had a reasonable expectation of privacy as an overnight guest.

Campbell appealed and we granted a certificate of appealability on the following claim only:  Whether the district court erred in denying, without an evidentiary hearing, Campbell's claim that his pretrial counsel provided ineffective assistance in his litigation of a motion to suppress evidence that was obtained during the search of a residence located at 7635 Praver Drive.

## II.    STANDARD OF REVIEW

"We review the district court's denial of an evidentiary hearing in a § 2255 proceeding for abuse of discretion."  Winthrop-Redin v. United States, 767 F.3d 1210, 1215 (11th Cir. 2014).  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous."  Id. (quotation marks omitted).  A § 2255 petitioner "is entitled to an evidentiary hearing if he alleges facts that, if true, would entitle him

to relief." Id. at 1216 (quotation marks omitted).  Although a petitioner "need only allege — not prove — reasonably specific, non-conclusory facts that, if true, would entitle him to relief," a district court "need not hold a hearing if the allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record." Id. (quotation marks omitted).

## III.    DISCUSSION

To prevail on his ineffective assistance of counsel claim, Campbell must "demonstrate both that (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" United States v. Webb, 655 F.3d 1238, 1258 (11th Cir. 2011) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)).  "We may consider the prongs of the Strickland test in either order, and [Campbell] must show that both prongs are satisfied in order to demonstrate a Sixth Amendment violation." Id.

### A.    Deficient Performance

Campbell cannot establish that his counsel rendered deficient performance in litigating his motion to suppress.  "The standard for counsel's performance is reasonableness under prevailing professional norms." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quotation marks omitted).  We do not "grade counsel's performance" because the "issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." Id.

11

(quotation marks omitted).  Campbell must show that "particular and identified acts or omissions of [his] counsel were outside the wide range of professionally competent assistance," and our review of counsel's performance is "highly deferential."  Id. at 1314 (quotation marks omitted).  Campbell argues that he can satisfy that heavy burden because Haine, his pretrial counsel, did not adequately investigate his connection to the Praver house and should have called him and other witnesses at the suppression hearing to establish that he had standing to challenge the search.

That argument fails.  Campbell states that Haine did not interview him, but he admits that Haine met with him on multiple occasions to discuss case strategy and that Haine complied with Campbell's request to file a motion to suppress the evidence from the Praver house.  Campbell faults Haine for not properly investigating his relationship with the Praver house, but his affidavit indicates that Haine reached out to Tamario Wiley (one of Campbell's friends who lived at the Praver house) to discuss the case.[3]  And the transcript from the suppression hearing shows that Haine was familiar with the facts of the case and applicable Fourth Amendment law, as he argued that Campbell had standing to challenge the search

---

[3] Wiley states in his affidavit that Haine never informed Wiley about the suppression hearing, but the affidavit states that Haine did meet with Wiley (and another friend of Campbell's), showed Wiley and the friend some of the evidence, and explained that Campbell did not have a good chance of winning his case.  Haine told Wiley that he did not think that Wiley would be a credible witness, though he did not explain why.

12

because he was more than a mere visitor at the Praver House. Although Haine may have been able to investigate more thoroughly Campbell's connection to the house, he knew that Campbell had given the Praver house as his residence when he was arrested and that the detectives' computer searches revealed a connection between Campbell and the Praver house. In light of those facts, Haine could have reasonably believed that he had enough information to establish standing and that his time would be better spent on other issues. See id. at 1318 ("[C]ounsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly.").

As for Campbell's argument that Haine should have called him and other witnesses to testify, we have stated that "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995); see also United States v. Long, 674 F.2d 848, 855 (11th Cir. 1982) ("This Court will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses."). In light of Campbell's testimony at trial that he did not reside at the Praver house (which was contrary to what he told the arresting officer) and the district court's finding that he perjured himself multiple times during trial,

13

Haine's fear that the government would trip Campbell up if he testified was not unreasonable.  As a result, Haine did not render deficient performance.

### B.    Prejudice

Even if Campbell could show that Haine's performance was constitutionally deficient, he cannot establish prejudice.  Because he alleges that Haine failed "to litigate a Fourth Amendment claim competently," to demonstrate prejudice he must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence."  Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S. Ct. 2574, 2583 (1986).  The government does not dispute that there is a reasonable probability that the verdict would have been different had the Praver house evidence been suppressed; the evidence from that search led to other evidence that established the amount of marijuana Campbell was trafficking.  But the government does argue that Campbell cannot establish a meritorious Fourth Amendment claim because he did not have a legitimate expectation of privacy in the Praver house.

Campbell bears the burden of "demonstrating a legitimate expectation of privacy" in the Praver house.  United States v. Baron–Mantilla, 743 F.2d 868, 870 (11th Cir. 1984).  Campbell neither owned nor leased the house, but the Supreme Court has held that "in some circumstances a person may have a legitimate

14

expectation of privacy in the house of someone else." Minnesota v. Carter, 525 U.S. 83, 89, 119 S. Ct. 469, 473 (1998). For instance, the Supreme Court has recognized that a houseguest "has a legitimate expectation of privacy in his host's home." Minnesota v. Olson, 495 U.S. 91, 98, 110 S. Ct. 1684, 1689 (1990). Campbell argues that he had an expectation of privacy as a houseguest because he went to the Praver house almost every day, even without an invitation, to play video games, listen to music, and hang out with his friends; he slept over at the house multiple times, including the night before the search; he kept personal possessions at the house, such as clothes, a laptop, and papers; and even though he did not have a key to the house, he could borrow Alex's or Wiley's keys or have them leave the doors unlocked so that he could enter.[4]

---

[4] We have stated that someone who does not own or rent the searched premises can establish a legitimate expectation of privacy "by demonstrating an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee." Baron–Mantilla, 743 F.2d at 870 (quotation marks omitted). Campbell asserts that he had an unrestricted right of access because Alex and Wiley let him into the house whenever he wanted, but that argument fails. Campbell did not have a key to the house. Although that fact is not dispositive, id., it is significant in showing that his ability to access the house was not unrestricted, cf. Rakas v. Illinois, 439 U.S. 128, 149, 99 S. Ct. 421, 433 (1978) (stating that an individual had a legitimate expectation of privacy where he "had permission to use the apartment of his friend" and had a key to the apartment, which gave him "complete dominion and control over the apartment" and allowed him to "exclude others from it"); United States v. Chaves, 169 F.3d 687, 691 (11th Cir. 1999) (concluding that defendant was "no mere guest or invitee" because he "had the only key to the warehouse, giving him a measure of control and ability to exclude others") (quotation marks omitted). Campbell had to borrow Alex's or Wiley's keys if no one was at the house, or ask them to leave the doors unlocked. And on the day the search took place, Campbell had to knock on the front door to gain entrance to the house after he put the UPS package in the garage.

Accepting those facts as true, Campbell cannot establish that he had a legitimate expectation of privacy in the Praver house as a houseguest. The Supreme Court has held that "in order to establish a reasonable expectation of privacy in a third-party's home, an individual must demonstrate [he] is a guest on the premises for a personal occasion, rather than for strictly a commercial purpose." United States v. Cooper, 203 F.3d 1279, 1285 n.3 (11th Cir. 2000) (citing Carter, 525 U.S. at 90, 119 S. Ct. at 474); United States v. Rhiger, 315 F.3d 1283, 1286 (10th Cir. 2003) ("[The Carter] Court drew a clear distinction between the status of individuals present at a residence for social purposes and those present for business or commercial matters."); United States v. Gamez–Orduño, 235 F.3d 453, 458 (9th Cir. 2000) ("An individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location.").

The facts establish that Campbell did not have a legitimate expectation of privacy in the Praver house because he was using it for a commercial purpose — trafficking in marijuana — when he was arrested. He admits that on the day of his arrest he had the UPS package containing marijuana sent to the Praver house. He also took possession of that package from the undercover officer making the controlled delivery. See United States v. Gray, 491 F.3d 138, 142, 146 (4th Cir. 2007) (Wilkinson, J.) (concluding that defendant lacked standing to challenge

16

search of his co-defendant's apartment because there was "no doubt that at the time

of his arrest [the defendant] was using [that] apartment to traffic in drugs").  And

when the police searched him they found over $5,000 in cash and a small amount

of marijuana on his person.  See id. at 146–47 (noting those facts in concluding

that defendant was on the premises for a commercial purpose).[5]

The affidavits make clear that Campbell hung out with his friends at the

house and kept personal possessions there.  See Carter, 525 U.S. at 85, 90–91, 119

S. Ct. at 471, 473–74 (concluding that defendants lacked standing because they

were at an apartment for only a few hours to bag drugs and had no previous

relationship with the apartment owner).  But, as the Fourth Circuit concluded in a

similar case, "the presence of scattered personal possessions are [not] sufficient to

transform what was essentially a business relationship into a social one."  Gray,

491 F.3d at 151 (concluding that defendant lacked standing where he visited his

co-defendant's apartment "four or five times a week," spending several hours

there; played video games and watched TV at the apartment; kept a change of

---

[5] Campbell relies on two cases to argue that his social ties to the Praver house outweigh his use of that house for his marijuana operation, but those cases are off point because the defendants were not using the residences in those cases for a business purpose at the time of their arrests.  See Rhiger, 315 F.3d at 1286–87 (concluding that defendant had standing to challenge search where he entered his friend's home to take a nap); Gamez–Orduño, 235 F.3d at 461 (concluding that defendants had a legitimate expectation of privacy while staying in a trailer to eat and rest).  And even though the house was leased to his brother, Campbell testified that he did not reside at the house.  Cf. Gray, 491 F.3d at 144 ("The Supreme Court has long held that the relatives of home owners who regularly reside at the residence are protected by the Fourth Amendment.").

clothes, his toothbrush, and PlayStation console at the apartment; and had spent the night there and borrowed his co-defendant's keys).  Not only was Campbell at the Praver house for a business purpose when he was arrested, but several facts show that he used the house as a base for his marijuana trafficking operation.  When the police searched the house, they found not only the UPS package containing marijuana and another 50-pound package of marijuana, but also four firearms, including an assault rifle with a 100-round magazine; a laptop with an open screen displaying a UPS tracking number; a money counter; and several thousand dollars in cash.[6]  That he socialized at the house and kept some possessions there do not erase the essential purpose of his visit on the day of his arrest — trafficking in marijuana.  See id. at 152 (noting that "[s]ocial interaction is, of course, incidental to many business dealings," and declining to "create a toothbrush or Nintendo rule that would inflexibly mark a relationship as social in the face of testimony of

---

[6] Campbell tries to minimize the commercial nature of the house by stating in his affidavit that he never made any drug deals at the Praver house in terms of meeting someone at the house to sell drugs and that he never used the house to package drugs.  But he does admit to using the house as a place to send drugs on at least two prior occasions, and the money counter and guns indicate that the house was a center of drug activity.  Campbell relies on the Sixth Circuit's conclusion in United States v. Pollard, 215 F.3d 643, 645–48 (6th Cir. 2000), that a defendant arrested at another person's house during a drug deal had standing to challenge the search, but in that case there was no evidence that the house was used for extensive drug operations.

extensive drug operations, replete with scales, large amounts of cash, neighborhood complaints, and multiple customers").[7]

Because Campbell cannot show that he had a legitimate expectation of privacy in the Praver house, he does not have a meritorious Fourth Amendment claim.  As a result, he cannot show that his counsel's alleged deficient performance caused actual prejudice.  Kimmelman, 477 U.S. at 375, 106 S. Ct. at 2583.

## IV.    CONCLUSION

Accepting as true the facts in Campbell's affidavits, he cannot demonstrate deficient performance or actual prejudice.  As a result, the district court did not abuse its discretion in denying his § 2255 motion without an evidentiary hearing. See Winthrop-Redin, 767 F.3d at 1216 ("A petitioner is entitled to an evidentiary hearing if he alleges facts that, if true, would entitle him to relief.") (quotation marks omitted); see also Diaz v. United States, 930 F.2d 832, 834 (11th Cir. 1991) ("[T]his court has held that on habeas a federal district court need not conduct an evidentiary hearing if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel.") (quotation marks and alterations omitted).

---

[7] And as the Fourth Circuit pointed out, if we accept the argument that hanging out a house and keeping possessions there automatically transforms a business relationship into a social one, "not only would every person planning illegal activity have a legitimate expectation of privacy in his own home, but also in the home of every acquaintance where he could stash some personal belongings." Gray, 491 F.3d at 152.

**AFFIRMED**.