*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CM-612 & 11-CM-613

LAMONT A. BILES, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CMD-557-11 & CMD-2107-11)

(Hon. Brook Hedge, Trial Judge)
(Hon. Geoffrey M. Alprin, Trial Judge)

(Argued October 4, 2012                      Decided October 23, 2014)

*Anna B. Scanlon*, for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Roy W. McLeese III*, Assistant United States Attorney at the time the brief was filed, and *John P. Mannarino* and *James A. Petkun*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court by *Associate Judge* BECKWITH.

Concurring opinion by *Senior Judge* FARRELL at page 30.

Opinion concurring in the judgment by *Associate Judge* THOMPSON at page 31.

BECKWITH, *Associate Judge*: On January 8, 2011, and then again on February 4, 2011, police arrested appellant Lamont Biles for peddling counterfeit DVDs at the Florida Avenue flea market in northeast Washington, D.C. Mr. Biles was later convicted, in a separate bench trial for each incident, of attempted deceptive labeling in violation of D.C. Code § 22-3214.01 (d)(1) (2001).

On appeal from his convictions, Mr. Biles contends that the government's midtrial disclosure in the first case of facts indicating that police had illegally searched Mr. Biles's backpack and his stash of DVDs kept him from filing what would have been a winning suppression motion and violated his right, under *Brady v. Maryland*, 373 U.S. 83 (1963), "to use the favorable material effectively in the preparation and presentation of [his] case," *Miller v. United States*, 14 A.3d 1094, 1107 (D.C. 2011) (quoting *Edelen v. United States*, 627 A.2d 968, 970 (D.C. 1993)). This late disclosure, he says, "continued to prejudice the defense" in his second case. The government counters that it is not clear or obvious, under the plain-error standard of review it urges us to use, that *Brady* applies to suppression hearings; that in any event Mr. Biles obtained the information in time to make good use of it; and that Mr. Biles's Fourth Amendment argument fails on the merits because he had no reasonable expectation of privacy in the items that were searched. Finding the government's arguments untenable, we reverse Mr. Biles's convictions.

## I. Background

Mr. Biles's bench trial for the January 8 incident began in Superior Court on April 11, 2011. Officer William Wilson of the Metropolitan Police Department (MPD) testified that he was walking the flea market in plain clothes, "trying to observe any criminal activity," when Mr. Biles approached and asked if he wanted to buy any DVDs. Officer Wilson made "eye to eye contact" with Mr. Biles, "told him no, I don't need any DVDs," and then reported the incident to Officer Diane Davis, a uniformed MPD officer also on patrol. Officer Davis testified that when she approached Mr. Biles shortly thereafter, he "just indicated he was not selling DVDs." She arrested and handcuffed Mr. Biles and, "[w]ithin a moment" of the arrest, received a phone call from a paid confidential informant who could see the officers.

Over the phone, the informant directed Officer Davis to a box beside "door number two"—one of three doorways into the market building, located approximately eight feet from where Mr. Biles had been standing—and stated, "That Mr. Biles, that's where he stores his movies." A stack of crates approximately three feet high sat next to the doorway, and as Officer Davis testified, a "box was sitting on top of the crates, and there was a knapsack bag that was on top of the box." Lifting up the backpack, Officer Davis discovered DVDs

in the box. Opening the backpack, she found Mr. Biles's personal identification card and his Social Security card.[1] A government expert later testified that the DVDs were counterfeit.

When Officer Davis testified that "[t]he source phoned me" and "directed me to the location of the box," defense counsel asked to approach and objected that "[t]here's no mention whatsoever" in the pretrial discovery materials "of a source giving any kind of direction," and that "we've never heard anything of it before this testimony." Defense counsel argued that "I didn't have an opportunity to do motions" or to "investigate it," and asked the court to "exclude any evidence [found] as a result of the tip." When the prosecutor said that he himself had learned about the informant "maybe 10 minutes before this case began" and had not realized that the informant had not been disclosed before trial "as part of police paperwork," the court told the prosecutor that "that was three hours ago and you should have told counsel as soon as you found out," "because she may have had a motion available to her." When the prosecutor proposed limiting Officer Davis's testimony, the trial court interrupted that "[w]ell, you really can't, because it's how she got to the box," and continued:

---

[1] The record does not indicate whether Mr. Biles saw the search. Officer Davis testified that two police officers on the scene "walked Mr. Biles over to the [police] vehicle as [she] simultaneously had gone over to the box." Mr. Biles was already handcuffed and under arrest when police received the informant's call.

The court: "I mean it's fundamental because it's what led them to the box. Otherwise they wouldn't have gone to the box."

The prosecutor: "Right."

The court: "I mean but for that phone call."

The prosecutor: "That's right."

The court: "Because it's not at all the way it was posited with respect to the opening [statement] that they just found it incident to the arrest, like it was right there by him . . . ."

The trial court nevertheless rejected the defense's oral motion to suppress the fruits of the informant's tip on two grounds—first, that "the confidential informant was not the reason why the defendant was stopped and about to be arrested," and second, that "the defendant has never asserted the DVDs were his. So there's a standing issue. I mean the only thing to suppress is the DVDs, and he's never asserted they're his, and so he doesn't really have standing to, I think probably to try to suppress it." The trial court concluded that "I think that sort of closes the door on anything further with respect to the confidential informant." The court then allowed the government to finish its case in chief and postponed the remainder of the trial to give the defense the additional time it requested to investigate the informant. The defense presented no witnesses when the trial resumed on May 4, 2011.

The trial court found Mr. Biles guilty of attempted deceptive labeling. In its findings of fact, the court noted that the backpack, which "had Mr. Biles's personal information in there," was "covering up the top of the DVDs, protecting it from sight." Mr. Biles was guilty, the court found, even though he "didn't have the DVDs on him"—much like some "drug transactions," where "somebody is going to keep their stash nearby where they know it's safe and in their line of sight so it can't be taken by anybody else, but also not on them so they can walk away and not be held accountable." The court further credited Officer Wilson's testimony that Mr. Biles "looked right at him and said I have DVDs for sale."

In a separate trial on April 18, 2011, Mr. Biles was convicted of attempted deceptive labeling for the February 4 incident, based largely upon Officer Davis's testimony that she linked the DVDs found in that case to Mr. Biles based on her observation of Mr. Biles's backpack near them—a backpack she knew was Mr. Biles's because of the identification cards found inside during the January 8 search. Mr. Biles appealed both convictions.

## II. Analysis

Mr. Biles argues that his first conviction must be reversed on grounds that the government's midtrial disclosure on April 11—specifically, that Officer Davis had uncovered the DVDs and his identification cards through a warrantless search

of his belongings—violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that the government timely disclose to the defense information that is "favorable to an accused," *id.* at 87; *Giglio v. United States*, 405 U.S. 150 (1972), whether the accused requests it or not, *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). The government's disclosure obligations encompass information known to police even if unknown to the prosecutor. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

"There are three components of a true *Brady* violation": the disputed information must be (1) "favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) "suppressed" by the government, "either willfully or inadvertently," and (3) material. *Strickler*, 527 U.S. at 281-82. Information is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A reasonable probability of a different result occurs when the suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). When the information is favorable, suppressed, and material, we must reverse

"irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The burden is on Mr. Biles to prove a *Brady* violation. *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011).

### A. Whether the Information Was Favorable

The government's sole argument on the question whether Officer Davis's testimony about the discovery of Mr. Biles's belongings was "favorable" for *Brady* purposes is that Mr. Biles did not sufficiently preserve his *Brady* claim, and that under the plain-error standard of review of *United States v. Olano*, 507 U.S. 725 (1993), he cannot demonstrate that it is "clear" and "obvious" that *Brady* applies to suppression hearings.[2] The government does not argue that the late disclosure of information material to the outcome of a pretrial suppression hearing cannot violate *Brady*, aside from saying the law is not clear. Instead, the government leaves for the second and third prongs of *Brady* its fallback arguments, contending that "even if this Court concludes that appellant has preserved his *Brady* claim, the claim still fails because appellant cannot show that the government suppressed the material or a reasonable probability of a different outcome."

The record in this case makes sufficiently clear that the trial court was fairly

---

[2] The heading for the government's argument on the favorability prong reads: "The Material Was Not Plainly Exculpatory or Impeaching."

apprised of the nature of Mr. Biles's claim. When Officer Davis first testified that an informant had phoned her and directed her to the DVDs, defense counsel asked the court to exclude the evidence stemming from this call, stating that there was "no mention whatsoever" of this information in pretrial discovery materials, that she had "never heard anything of it before this testimony," and that she "didn't have an opportunity to do motions" or "an opportunity to do anything on this." The trial judge then described the withheld information as "fundamental because it's what led them to the box" and chided the prosecutor that he "should have told counsel as soon as [he] found out" because Mr. Biles's counsel "may have had a motion available to her." While counsel did not invoke *Brady* by name, the claim she was making had the clear hallmarks of a *Brady* claim—that the government failed to disclose information favorable to the accused that would have made a difference to the outcome of the proceeding—and it is preserved for appellate review. *See, e.g.*, *Parsons v. United States*, 15 A.3d 276, 279 (D.C. 2011) (holding that defense counsel's request to exclude seized drugs, combined with counsel's closing argument that evidence of the informant's reliability was "insufficient and not correct," was enough to preserve for appeal a Fourth Amendment claim); *Tindle v. United States*, 778 A.2d 1077, 1081 (D.C. 2001) (holding that Mr. Tindle preserved his claim under *Edwards v. Arizona*, 451 U.S. 477 (1981), even though neither the attorneys nor the trial judge mentioned *Edwards*).

Turning to the merits, the government, again, identifies no reason *Brady* should not apply to the failure to disclose information material to suppression hearings, and we likewise find no basis in our case law. We have repeatedly held that information tending to show the inadmissibility of government evidence is "favorable" evidence that must be disclosed under *Brady*. In *Gaither v. United States*, 759 A.2d 655 (D.C. 2000), *amended by* 816 A.2d 791 (D.C. 2003), we remanded for findings on whether the government had withheld *Brady* information pertaining to suggestive identification procedures. In *Smith v. United States*, 666 A.2d 1216, 1224-25 (D.C. 1995), we held that the government violated *Brady* by failing to disclose a witness statement that undermined the admissibility of a government witness's purportedly spontaneous utterance. And in *James v. United States*, 580 A.2d 636 (D.C. 1990), we similarly evaluated under *Brady* a late-disclosed witness statement that "cast[] serious doubt" upon the trial court's finding that another statement it admitted "was truly spontaneous." *Id.* at 638.

And while we have never had occasion to explicitly address whether information is "favorable" for *Brady* purposes if it relates to a defendant's claim at a Fourth Amendment suppression hearing rather than at trial, we have assumed as much in at least one case. In *Porter v. United States*, 7 A.3d 1021 (D.C. 2010), Eugene Porter contended that his due process rights under *Brady* were violated when the government failed to turn over information about an informant that, in

Mr. Porter's view, would have shown that police lacked probable cause to arrest and search him and that his motion to suppress evidence should have been granted. *Id.* at 1023. This court, never questioning that *Brady* applied in such circumstances, held that the information at issue "was not material to the defense" given that the informant did not testify and that the police were not aware of the information when they decided to arrest and search Mr. Porter.[3] *Id.* at 1026.

---

[3] Many courts have similarly assumed without deciding that such information can be favorable for *Brady* purposes. *See, e.g.*, *United States v. Veras*, 51 F.3d 1365, 1375 (7th Cir. 1995) (finding "no fault" with the district court's conclusion that "'[b]ecause the suppressed evidence would not have affected the outcome of the suppression hearing or the trial, defendant's due process rights were not violated and his motion for a new trial pursuant to *Brady* and *Giglio* is denied'"); *United States v. Williams*, 10 F.3d 1070, 1077 (4th Cir. 1993) ("[W]e assume *arguendo* but decline to address definitively on the merits the issue of whether *Brady* should call for disclosure of material evidence at pre-trial suppression hearings" because "[t]he evidence allegedly withheld by the government regarding conflicting eyewitness reports was not material to the determination of probable cause" to arrest the defendants.); *United States v. Taylor*, 471 F. App'x 499, 520 (6th Cir. 2012) ("Assuming without deciding that *Brady* applies to suppression hearings, we nonetheless conclude that the evidence about Agent Lucas was not material to the suppression-hearing proceedings or to the trials held in this case."); *United States v. McCoy*, 348 F. App'x 900, 902 (4th Cir. 2009) ("Assuming, without deciding" that evidence regarding the legality of a *Terry* stop was "was both favorable and withheld under *Brady*, McCoy failed to prove that the new evidence was material."); *United States v. Bullock*, 130 F. App'x. 706, 723 (6th Cir. 2005) (noting the "questionable relevance" of *Brady* to "whether the suppression hearing might have come out the other way," but concluding that appellant could not show prejudice); *United States v. Johnson*, No. 96-2008, 1997 WL 381926 (10th Cir. July 7, 1997) ("[A]ssuming that the evidence identified by Mr. Johnson was in fact withheld by the prosecution and favorable to Mr. Johnson . . . we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a *Brady* violation," where the

The only courts we know to have squarely addressed the issue on the merits have held that the failure to disclose information material to a ruling on a Fourth Amendment suppression motion can constitute a *Brady* violation.[4] In *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992), the government failed to disclose evidence that would have bolstered the impeachment of a detective who testified at a suppression hearing involving the warrantless seizure of evidence from the defendant's car and home. The Fifth Circuit concluded that "objections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing," *id.* at 965, and that "the appropriate assessment for *Brady* purposes" was whether the nondisclosure

---

evidence would have undermined the officer's credibility during a pretrial suppression hearing where the officer and the defendant disputed whether the defendant had consented to a car search.).

[4] A split of authority exists on the different but related question whether *Brady* applies to information that would impeach police officers' affidavits in support of search warrants. *Compare United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993) (concluding "that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant" where the concealed information would have impeached the police officer's claim that he had probable cause to search the defendant's home), *with United States v. Colkley*, 899 F.2d 297, 303 (4th Cir. 1990) (declining to extend *Brady* to the warrant application process so as to avoid "perniciously prolix affidavits that would distract police officers from more important duties and render the magistrate's determination of probable cause unnecessarily burdensome"). The logistical concerns raised in *Colkley* are not present in Mr. Biles's case, which involves disclosure of information relevant to a trial court's pretrial suppression ruling, not a magistrate's probable cause determination at the warrant phase.

"affected the outcome of the suppression hearing," *id.* at 956-66. In *United States v. Gamez-Orduno*, 235 F.3d 453 (9th Cir. 2000), the government failed to timely disclose a codefendant's statement that contradicted the government's assertion that the defendants lacked standing to challenge on Fourth Amendment grounds the Border Patrol's warrantless search of the trailer where the defendants resided. The Ninth Circuit concluded that "[t]he suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* at 461.[5] In addition, at least one court has held that *Brady* applies to suppression hearings alleging *Miranda* violations. *See Nuckols v. Gibson*, 233 F.3d 1261, 1266-67 (10th Cir. 2000) (finding a *Brady* violation where "the prosecution withheld evidence that would have allowed defense counsel the means to test [the police officer's] credibility" where the admissibility of Mr. Nuckols's confession "hinged upon proof" that he initiated the interview).[6]

---

[5] The courts in *Smith* and *Gamez-Orduno* ultimately rejected the *Brady* claims in those cases on grounds that the suppressed information was not "material" to the outcome of the hearing. We discuss materiality *infra* in Part II.C.

[6] Some courts have simply noted that, for plain error purposes, the applicability of *Brady* to Fourth Amendment suppression hearings was not "obvious." *See, e.g.*, *United States v. Nelson*, 193 F. App'x 47, 50 (2d Cir. 2006) (remanding on other grounds and declining to answer "[w]hether *Brady* and its

We agree that the suppression of material information can violate due process under *Brady* if it affects the success of a defendant's pretrial suppression motion. We have described as "eminently sensible" a broad formulation of the government's *Brady* obligation that would reach the kind of evidence "that would suggest to any prosecutor that the defense would want to know about it," *Miller v. United States*, 14 A.3d at 1110 (quoting *Leka v. Portuondo*, 257 F.3d 89, 99 (2d Cir. 2001)); *see also Mackabee*, 29 A.3d at 962 (D.C. 2011), and a rule prohibiting the government from suppressing favorable information material to a Fourth Amendment suppression hearing would impose little if any additional burden on prosecutors and police beyond the obligations that court rules and professional standards already impose. *See, e.g.*, USAM § 9-5.001.C.2 (requiring disclosure of information that "might have a significant bearing on the admissibility of prosecution evidence"); D. MASS. L. R. 116.1 (c)(1)(B) (requiring that the

progeny require disclosures in advance of pre-trial hearings"—"an open question in this circuit"); *United States v. Stott*, 245 F.3d 890, 902 (7th Cir. 2001) (stating that "we cannot say that the law is clear on the question of whether *Brady* should apply to suppression hearings"); *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) (stating that "it is hardly clear that the *Brady* line of Supreme Court cases applies to suppression hearings"). The *Bowie* court, briefly reflecting on an argument the appellant "faintly" and "obliquely" made in a heading of his reply brief, reasoned in *dicta* that suppression hearings "do not determine a defendant's guilt or punishment," and thus presumably would be beyond the scope of *Brady*. *Bowie*, 198 F.3d at 912. But the court explicitly made clear that the issue was not briefed and that it was not purporting to formally consider or decide it. *Id.* For the reasons stated in this opinion, we find this *dicta* unpersuasive.

government disclose within 28 days of arraignment a written description of an incriminating warrantless search, including an inventory of items seized); D. MASS. L. R. 116.2 (a)(2) (requiring disclosure of information that "tends to . . . cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief").[7]

Having held that the failure to disclose information material to a pretrial suppression ruling can implicate *Brady*, we conclude that the withheld information here, which tended to show that the search could not be justified as a routine search of a suspect's wingspan incident to arrest, was favorable for purposes of the *Brady* doctrine.

## B. Whether the Information Was Suppressed

To prove a *Brady* violation, a defendant must show not only that the information at issue was "favorable" to the accused, but that it was "suppressed." Evidence is "suppressed" for *Brady* purposes if the government failed to disclose it

---

[7] It is worth noting that the Jencks Act, which codified in large part the Supreme Court's decision in *Jencks v. United States*, 353 U.S. 657 (1957), setting forth the government's obligation to disclose prior statements of its witnesses for impeachment purposes, applies at suppression hearings. *See* 18 U.S.C. § 3500 (b) (2006) (requiring prosecutors to disclose any statement of a witness in the possession of the United States that relates to the subject testified to by the witness on direct examination); Fed. R. Crim. Proc. 26.2 (g) (extending this requirement to suppression hearings); D.C. Super. Ct. R. Crim. Proc. 26.2 (g) (same).

"in time to permit [the defense] to contemplate its implications" and to make "new investigative, strategic and tactical decisions," "not only in the presentation of its case, but also in its trial preparation." *Miller*, 14 A.3d at 1111-12. "[W]here disclosure of *Brady* is concerned, there is no time for strategic delay and 'as soon as practicable' should be the approach." *Vaughn v. United States*, 93 A.3d 1237, 1257 (D.C. 2014) (quoting *Miller*, 14 A.3d at 1111). *See also United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001) (requiring disclosure "no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made"); *Edelen v. United States*, 627 A.2d 968, 970 (D.C. 1993) (disclosure must be "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure") (quotation marks and citation omitted). Here, the government says it did not suppress information about the true basis for the post-arrest search of the DVD stash and backpack because Mr. Biles still had "plenty of time to make effective use of it" during the lengthy continuance from April 11 to May 4.

After a full review of the record, we conclude that the government's untimely midtrial disclosure of a completely new and different basis for the search—that is, the government's disclosure that the DVDs and items in Mr. Biles's backpack were not, in fact, retrieved from the area of Mr. Biles's wingspan,

incident to arrest—denied Mr. Biles a fair opportunity to challenge the legality of the search. In the confused aftermath of Officer Davis's unexpected testimony about the informant and the warrantless search, counsel tried to quickly digest the import of the new information, orally moved to "exclude" the evidence, and asked permission to question Officer Davis at length about the informant. The trial court allowed questioning about the informant's prior cases but denied the request to exclude the fruits of the search, and in the process made clear its position that Mr. Biles lacked standing to move to exclude the fruits of the search on any basis because he "has never asserted the DVDs were his," telling counsel "that sort of closes the door on anything further with respect to the confidential informant." Thus, even if counsel had possessed the wherewithal in the wake of the belated disclosure to think beyond the informant-related issues and to appreciate the full legal significance of the warrantless search, she had no reason to further move to suppress the fruits of the search on any basis after the trial court's standing ruling. Counsel "cannot be faulted for believing that, by then, the die had been cast." *Brooks v. United States*, 39 A.3d 873, 882 (D.C. 2012). *See also Wilkins v. United States*, 582 A.2d 939, 942 n.7 (D.C. 1990) (noting that "defense counsel did not need to object again to preserve his claim of error on appeal" once the court "implicitly overruled [an] objection"); *United States v. Freeman*, 357 F.2d 606, 613 (2d Cir. 1966) (concluding that a colloquy with counsel "sufficiently

enlightened the court as to the point being raised," and that any further showing would have been "an exercise of futility").

Given the strength of Mr. Biles's would-be claim that the warrantless search did not fit within any recognized exception to the warrant requirement, and the fact that Officer Davis's unexpected disclosures ran directly counter to the version of the facts presented by the government in documents previously given to counsel,[8] it is hard to read counsel's failure to further pursue the suppression issue as logically attributable to anything but the trial court's dismissive ruling and the "hasty and disorderly conditions under which the defense was forced to conduct its essential business." *Miller*, 14 A.3d at 1113 (quoting *Leka*, 257 F.3d at 101).[9]  As

---

[8]  The police report signed by Officer Davis stated:  "Mr. Biles was arrested.  Mr. Biles['s] movies [w]ere stored in a box adjacent to door #2 on a crate.  Mr. Biles was in possession of 156 DVD's . . . ."  And as the trial court noted, the version of events Officer Davis presented at trial was "not at all the way it was posited with respect to the opening [statement] that they just found it incident to the arrest, like it was right there by him . . . ."

[9]  The sheer volume of questions asked by counsel of Officer Davis about the informant indicates the extent to which counsel was distracted by the government's unexpected midtrial disclosure.  Rather than focusing on whether the warrantless search fit into any recognized exception to the warrant requirement, counsel spent considerable time asking, for example, whether the informant was employed by MPD, how Officer Davis knew the informant, what it meant to be the informant's "handler," how the informant referred to Mr. Biles in the phone call, whether the informant's past tips had been reliable, whether the informant had a relationship with Mr. Biles, whether Officer Davis knew what the informant did for a living, whether Officer Davis knew the informant's criminal history, whether the informant had any pending criminal cases, whether Officer Davis and the

for the government's suggestion that Mr. Biles should have sought reconsideration of the court's standing ruling, we have rejected the notion that when forced to respond to belatedly disclosed material, counsel must "evaluate immediately all potential ramifications of the evidence 'or else waive the right to complain later.'" *Miller*, 14 A.3d at 1114 (quoting *James*, 580 A.2d at 643). While an "ideally vigilant" lawyer may have quickly produced authority to persuade the trial court that Mr. Biles did have standing to challenge the search, Mr. Biles was not required to seek reconsideration of the trial court's decision. *See James*, 580 A.2d at 644 ("[A]ppellant's failure to move for a mistrial or to ask the court to revisit its spontaneous utterance ruling does not bar his claim here."); *S.E.C. v. Mayhew*, 121 F.3d 44, 53-54 (2d Cir. 1997) ("Generally, a party disadvantaged by a district court's ruling is not required to move for reconsideration in the district court as a

informant had discussed Mr. Biles before the informant called Officer Davis, whether the informant was under the influence of drugs or alcohol when he or she made the phone call, how many of the informant's eight prior tips were related to the Florida Avenue flea market, how long the informant had been providing MPD with tips, whether the prior tips were accurate, whether the informant got paid for the tip about Mr. Biles, how much the informant ordinarily got paid, whether prior tips had led to arrests, whether prior tips had led to convictions, and whether the informant been paid for a tip that led to an arrest in a separate investigation that Officer Davis had been conducting. Following this lengthy cross-examination, counsel asked the court to order the government to disclose "information on the cases that this individual has worked on before to see if there were convictions" and argued that although Officer Davis had testified that the informant had provided eight tips that led to arrests, "[t]he fact that they arrested someone based on a confidential tip doesn't prove that tip to have been correct or valid or anything else."

precondition to an appeal from the ruling.").

In sum, the government's belated midtrial disclosure of the true basis for the search, coupled with the trial court's standing ruling, closed the door on any future Fourth Amendment suppression motion. It thus foreclosed any meaningful opportunity on Mr. Biles's part "to use the information with some degree of forethought," *Miller*, 14 A.3d at 1112, and to frame and litigate what should have been a successful motion.[10]

---

[10] At oral argument the question arose, during Mr. Biles's counsel's argument, whether the government could have "suppressed" evidence for *Brady* purposes if the defendant himself may have known about it. The Supreme Court has not explicitly addressed and state and federal courts are split on this "due diligence" question. In the District of Columbia, the federal court of appeals has held that because the government is responsible for "any favorable evidence known to the others acting on the government's behalf," it is not the defendant's burden to obtain it. *In re Sealed Case*, 185 F.3d 887, 896 (D.C. Cir. 1999) (citation omitted). Here, the government has not suggested that this is a case in which—like the typical "due diligence" scenario—defense counsel failed to look through a file or the defendant refused to answer a specific question by counsel or the court about a favorable witness he knew about. Mr. Biles knew the location of the items, but there is no indication that he was trained in Fourth Amendment jurisprudence. His attorney, on the other hand, is trained in the law but had no reason to know the true basis for the warrantless search. Even if counsel had explicitly asked Mr. Biles why police arrested him and whether officers saw the items in question, there is little indication from the *Gerstein* affidavit or any other evidence in the record that Mr. Biles or his counsel had reason to understand the precise basis for, or timing of, his arrest or the search of the items. Moreover, the question whether the "due diligence" doctrine is consistent with *Brady* and its progeny is an unresolved and complicated one. *See generally* Kate Weisburd, *Prosecutors Hide, Defendants Seek: The Erosion of* Brady *Through the Defendant Due Diligence Rule*, 60 U.C.L.A. L. Rev. 138 (2012). We decline to address the issue in a case where the

## C. Whether the Information Was Material

Mr. Biles argues that information about the warrantless search of his belongings was material for *Brady* purposes because had he known about it, he could have filed a timely suppression motion that would have been granted, thus depriving the government of the most important evidence in its case—the DVDs and the identification cards linking Mr. Biles to the DVDs.  He argues that because this scenario would have resulted in an acquittal or dismissal, he has demonstrated a reasonable probability—in fact, much more than a reasonable probability—that "had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  Based on our review of the record and the relevant case law, we agree.

"'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  In defending the legality of the warrantless search in this case, the government does not rely on the trial court's "standing" ruling—which it

government has not briefed it and where the facts make clear that the doctrine would not squarely apply.

appears to agree was erroneous[11]—or the search-incident-to-arrest warrant exception, which it agrees does not apply.[12] Rather, the government relies solely on an abandonment argument. In its view, "Officer Davis did not invade any reasonable expectation of privacy on appellant's part when she first moved the backpack to see the DVDs, and then looked inside that backpack" because Mr. Biles "abandoned the DVD stash and his backpack by leaving them in a public area" and by telling Officer Davis that he "was not selling DVDs." Because he had no reasonable expectation of privacy, the government argues, there was no "search" implicating the Fourth Amendment, the discovered items would not have been suppressed, and there was no reasonable probability of a different outcome.

We do not agree that Mr. Biles's statement to Officer Davis that he "was not

---

[11] The government agreed at argument that a defendant's failure to assert ownership of property, while potentially relevant to whether he has abandoned the property and thus retains no reasonable expectation of privacy with respect to it, does not defeat his "standing" to assert a Fourth Amendment claim. *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 138-39 (1978) (choosing to "dispens[e] with the rubric of standing" for Fourth Amendment purposes and instead to focus solely on the question whether the movant's personal Fourth Amendment rights were violated, thus allowing any standing issues to be "subsumed" within "substantive Fourth Amendment doctrine").

[12] At oral argument the government disclaimed any reliance on the search-incident-to-arrest exception. This is consistent with the trial court's comment on April 11 that "but for that phone call" from the informant the police "wouldn't have gone to the box" and the trial court's suggestion that the government had inaccurately implied "that [the police] just found it incident to the arrest, like it was right there by him." Indeed, although it is not an issue in this appeal, the record indicates no legal justification for Mr. Biles's warrantless arrest.

selling DVDs" indicates that Mr. Biles relinquished an expectation of privacy in the contents of the backpack—which Mr. Biles never mentioned in the statement— or in the box of DVDs beneath the backpack. At the time of the statement, the police had not seen or been alerted to the existence or location of the backpack or box of DVDs, which were sitting eight to ten feet away. The trial court's findings also indicate that the items were not discarded or exposed to public view. In explaining its judgment that Mr. Biles was guilty of attempted deceptive labeling, the trial court found that the backpack was "covering up the top of the DVDs, protecting it from sight" and that by keeping "his knapsack on top of" the DVDs, Mr. Biles "in essence, was claiming dominion and control and keeping it in place and securing it for himself and covering it so others wouldn't see what was under there." He knew they were "safe and in [his] line of sight so [they could not] be taken by anybody else."

Thus, while the events took place in a "public" market, Mr. Biles's expectation, manifest in his actions and in no way contradicted by his response to police inquiries, was that the items would remain private. *See Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.") (citations omitted); *id.* at 352 (noting that the appellant

acted to exclude the "uninvited ear" by shutting the phone booth door); *Brown v. United States*, 627 A.2d 499, 503-04 (D.C. 1993) (considering whether appellant "took reasonable precautions to maintain privacy" and concluding that by leaving the door open, he had not). This case thus differs from cases in which a movant seeks to discard an item or places it in public view. *See, e.g.*, *Allison v. United States*, 623 A.2d 590, 591 (D.C. 1993) (concluding that the appellant abandoned his gun by discarding it while fleeing a police officer). Other than Mr. Biles's statement and the items' location, the government suggests no basis—and we see none—for finding that he relinquished his expectation of privacy. This expectation, moreover, was not defeated merely because Mr. Biles stood in a public market; rather, it remained "one that society is prepared to recognize as 'reasonable,'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring), particularly where Mr. Biles kept his belongings protected from view and "in [his] line of sight."

Because Mr. Biles had a reasonable expectation of privacy in his belongings and because the warrantless search of those items did not fall within an exception to the Fourth Amendment's warrant requirement, the DVDs hidden under his backpack and the identification cards recovered from the backpack should have been suppressed. *See United States v. Chadwick*, 433 U.S. 1, 15 (1977) (prohibiting "warrantless searches of luggage or other property seized at the time of an arrest" unless conducted incident to arrest or in exigent circumstances).

Without the DVDs, the government could not prove that the DVDs were counterfeit, and without the identification cards, the government would have had trouble linking Mr. Biles to the DVD stash. We accordingly find a reasonable probability that the government's failure to timely disclose the information affected the outcome of the trial by preventing Mr. Biles from litigating a winning motion to suppress the government's most damning evidence against him. The government's suppression of this information therefore "undermines confidence in the outcome of the trial," and requires reversal of Mr. Biles's first conviction. *Kyles*, 514 U.S. at 434.

### D. Effect on the Second Trial

We reverse Mr. Biles's second conviction for attempted deceptive labeling because the government in the second trial heavily relied on the same evidence illegally obtained in the earlier January 8 incident, and there is "a reasonable probability that, had the evidence been disclosed to the defense" in the first trial, as we have concluded that it should have been, the result of the second trial "would have been different." *Bagley*, 473 U.S. at 682.[13]

On February 4, 2011, the same Officer Davis arrested Mr. Biles for peddling

---

[13] The government does not appear to dispute that the outcomes of both the first and second trials would have been different absent the ability to introduce the items in question.

counterfeit DVDs at the Florida Avenue flea market, again on an informant's tip. At trial on April 18, 2011, Officer Davis testified that Mr. Biles did not possess DVDs on his person and that she did not see Mr. Biles sell DVDs. But she did see a backpack about eight feet away that was "distinct" to her because she "recognized it" from her previous arrest.[14] She "went over and recovered the property and then [she] brought that property back to show him what [she] had recovered." She then searched the backpack, which contained "nothing that had Mr. Biles'[s] name on it." She nonetheless recognized it as Mr. Biles's because she had searched it on January 8, when his "personal property was inside the book bag with his name on it." The backpack had been leaning against a stack of crates, and atop the crates, Officer Davis found a shoe box containing 52 DVDs.[15] In closing argument, the government emphasized that "the one fact in this case that links and ties the defendant to these DVDs" is that Officer Davis "saw the defendant's own bag, the bag she knew was his, next to the crate where the DVDs

---

[14] The government offered this testimony to prove Mr. Biles's knowledge of the counterfeit nature of the DVDs—an element of the crime. Defense counsel objected, arguing that it "has nothing to do with the knowledge element" and that "[i]f it only goes to knowledge, she only needs to testify to what they were, not where they were, how she found them or any of the other information." The court ruled that it would "permit this testimony to stand for the purpose that [the government] has suggested."

[15] The government's expert later concluded that the DVDs "were pirated" because they lacked the "true name and address of manufacturer" and many "were still in the movie theaters at the time of the individual's arrest."

were located," and "[t]he fact that his bag is there is the one thing that harms their case, and they can't get past it." Judge Alprin found Mr. Biles guilty based in part on "pretty strong evidence in the case that this was Mr. Biles['s] backpack" and that "the DVDs in controversy" were sitting near the bag. Defense counsel asked the trial court to reconsider and "appreciate that the prior arrest may have influenced your decision," to which the court replied: "The arrest didn't. The circumstances of it did, though."

The government argues that Mr. Biles's *Brady* claim with respect to this second trial fails "for the same reasons" as the first, but we have already rejected those reasons. Nor do we agree that Mr. Biles "had enough time to make sufficient use of the material" in the second trial, where the court in the first trial foreclosed that opportunity by ruling that Mr. Biles lacked standing to challenge the search.[16] Officer Davis's testimony that on January 8, Mr. Biles's "personal property was inside the book bag with his name on it" became the predominant evidence of guilt at this trial. Nothing else so definitively linked Mr. Biles to the shoebox of DVDs,

---

[16] *See supra* Part II.B. *See also Kritsidimas v. Sheskin*, 411 A.2d 370, 373 (D.C. 1980) (stating that suppression motions "demand detailed judicial consideration of specific facts" and "often require hearings and findings of fact," which are "the kinds of judicial exercises the 'law of the case' doctrine is designed to prevent being repeated"); *Jenkins v. United States*, 284 A.2d 460, 463-64 (D.C. 1971) (stating that rulings on pretrial suppression motions constitute the law of the case).

as the police did not see Mr. Biles selling DVDs and did not find DVDs in his physical possession when searching him incident to arrest. Absent this testimony, derived from the illegal search on January 8, we do not have confidence in the outcome of the trial.

### III. Conclusion

Until the arresting officer took the witness stand at trial, the defense did not know that the government had conducted a warrantless search of Mr. Biles's belongings that could not be justified under any exception to the warrant requirement. The officer's disclosure of the true basis for the search—an informant's tip, rather than a search incident to arrest—was favorable to a winning Fourth Amendment motion that would have excluded key evidence of guilt in both trials. Yet in the chaotic aftermath of the midtrial disclosure, and following the trial court's ruling that Mr. Biles lacked standing to further argue for exclusion of the items, Mr. Biles could not make effective use of the disclosed information. As there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,"[17] *Bagley*, 473

---

[17] While we have characterized the Fourth Amendment challenge to the warrantless search as a meritorious claim, our precise holding in that regard—that under *Brady,* we find a reasonable probability that the delayed disclosure affected the outcome in this case—does not strictly preclude further litigation of the suppression issue on remand.

U.S. at 682, we reverse the judgments of conviction and remand Mr. Biles's cases for further proceedings consistent with this opinion.[18]

So ordered.

---

[18] Given this resolution, we do not reach Mr. Biles's other claims of error: that the midtrial disclosure of "the distance of the box of DVDs" from Mr. Biles "denied the defense the opportunity to investigate, craft, and present a more detailed challenge to the government's constructive possession case," and that "the government did not establish by clear and convincing evidence that the appellant was actually guilty of deceptive labeling before allowing testimony about his previous arrest into evidence."

FARRELL, *Senior Judge*, concurring: Had appellant brought this appeal on Fourth Amendment grounds, we almost certainly would have reversed his convictions on that basis, for reasons apparent from Judge Beckwith's opinion and footnote 1 of Judge Thompson's opinion concurring in the judgment. But appellant has not sought reversal on that ground, and accordingly the government discusses the legality of the search and seizure only as part of its *Brady* materiality analysis. Judge Thompson suggests that our unwillingness to stray from the framework presented by the parties leads us unnecessarily to decide a novel issue of *Brady's* applicability (*vel non*) to Fourth Amendment suppression hearings. But the government, for its part, barely alludes to that issue as a basis for us to find no "plain error" in the trial court's resolution of an (in its view) unpreserved *Brady* claim. And even then, the government does not suggest the refined distinction Judge Thompson makes between "impeaching" *Brady* evidence, applicable to suppression hearings, and "exculpatory" *Brady* evidence, inapplicable to them in her view unless negating guilt on the general issue, even if favorable to a winning suppression motion.

I join Judge Beckwith's opinion because it seems to me consistent with the understanding of our cases. Judge Thompson's position, or a variant of it, is one I can imagine the government advancing in a future case, but not before a good deal of reflection. Should *Brady* have no bearing, for example, on a prosecutor's

purposeful, deliberate concealment of evidence – whether "exculpatory" or not – that he knows would require Fourth Amendment suppression if revealed?  Or might the government, borrowing from exclusionary rule analysis, limit itself to arguing that a *Brady* reversal perhaps years after trial for a prosecutor's inadvertent, unintentional nondisclosure of evidence favorable to a defense suppression motion – but not otherwise "exculpatory" – exacts too great a cost to a conviction returned on probative and reliable evidence of guilt.  *Cf. Herring v. United States*, 555 U.S. 135 (2009).  Judge Thompson's analysis provocatively raises questions of this sort, but this case is not the place to consider them.

THOMPSON, *Associate Judge*, concurring in the judgment:  I agree with my colleagues that appellant is entitled to a reversal of his convictions.  That is because the principal evidence on which his convictions were based was the fruit of a warrantless search, as to which the trial court should not have foreclosed what would have been a meritorious Fourth-Amendment suppression motion.[1]

---

[1]  The majority opinion discussed this only in the context of explaining why the information not disclosed prior to trial was material for *Brady* purposes.  But the majority's analysis fully explains why the trial court erred in ruling that appellant lacked standing to raise a Fourth Amendment claim, thereby effectively foreclosing a suppression motion.  The salient points of that analysis are (1) that by keeping his backpack on top of the box of DVDs, thereby protecting the DVDs from sight, and at the same time keeping both items in his "line of sight so [they could not] be taken by any[body] else[,]" appellant was both exercising dominion and control over the items and maintaining his expectation of privacy as to each item and its contents; and (2) that since appellant had a reasonable expectation of

Alternatively, I think appellant has grounds for a likely-meritorious motion for a new trial based on ineffective assistance by his trial counsel.[2] However, I cannot join the majority opinion because it bases the reversal of appellant's convictions on a conclusion that the delayed disclosure about the "true basis" for the search of the

---

privacy with respect to the items, the items were not in "the area 'within his immediate control,'" *Chimel v. California*, 395 U.S. 752, 763 (1969), and there were no exigent circumstances, Officer Davis's warrantless search of the backpack and the box violated the Fourth Amendment, and the DVDs and identification cards she found inside should have been suppressed. The trial court's error in ruling that appellant lacked standing to seek suppression was not harmless, because, as the majority opinion notes, without the DVDs, the government could not prove that they were counterfeit, and without the identification cards, the government would have had trouble linking appellant to the DVDs.

[2] On the present record, it certainly seems that trial-counsel should have been able to determine, upon interviewing her client, (1) that the police did not find DVDs on his person or within his reach during a search incident to arrest, and (2) that the DVDs which the Gerstein affidavit stated were "stored in a box adjacent to door #2 on a crate" were not in plain sight and were under a backpack that police would have had to open and search to find identifying information associating it with appellant. With that information, even without knowing that a confidential informant had led the officer to the box and backpack, counsel would have had what she needed to file a motion to suppress, on Fourth Amendment grounds, the box of DVDs and the backpack and its contents. After the trial testimony that first informed trial counsel about the confidential informant's having led the officer to the box of DVDs that was eight feet away from appellant at the time of his arrest, the court continued the trial for twenty-three days to give counsel time to respond to the new information. That was enough time for what the majority opinion calls the "aftermath of confusion" to dissipate. It is difficult for me to believe that counsel did not have time to identify the Fourth Amendment issue and to find the case law (the majority opinion cites *Rakas v. Illinois*, 439 U.S. 128, 138-40 (1978) ("dispensing with the rubric of standing" for Fourth Amendment purposes)) that she could have presented to the trial court to explain why appellant did not lack "standing" to raise a Fourth Amendment claim.

backpack and box of DVDs constituted a *Brady* violation. That is a conclusion with which I cannot agree; I believe it expands the reach of *Brady* in a way that is not justified [and in a way whose ramifications we perhaps cannot foresee].

It is well-settled that for there to be "a true Brady violation[,]" "[t]he evidence at issue must be favorable to the accused, *either because it is exculpatory, or because it is impeaching*; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (italics added). My reason for not joining the majority opinion is that the information at issue here — that a confidential informant let Officer Davis know that the DVDs stored near door # 2 were appellant's stash — was inculpatory, not exculpatory, and was not impeaching of any witness. As to the latter point, I note that appellant has not claimed that the information Officer Davis provided at trial about what led her to search the box and backpack impeached the statements she made in her *Gerstein* affidavit. In the *Gerstein*, Officer Davis stated in pertinent part:

> Mr. Biles movies where [sic] stored in a box adjacent to door #2 on a crate. Mr. Biles was in possession of 156 DVD's [sic] some of which are [sic] still being shown in theaters . . . . Seized from Mr. Biles right front pants pocket was $135.30 in US currency.

The *Gerstein* did not falsely state that DVDs were found on appellant's person or within his reach, and appellant has not claimed that the affidavit falsely implied that either was the case.[3] I agree that if the affidavit had done so, the government's failure to timely correct such a false statement and disclose the true basis for the search would have violated the government's obligations under *Brady*.[4] *See United States v. Bagley*, 473 U.S. 667, 679 n.8 (1985) ("[T]he *Brady* rule has its roots in a series of cases dealing with convictions based on the prosecution's knowing use of perjured testimony.").[5] But, again, appellant has not made that

---

[3] Appellant's trial counsel acknowledged that the *Gerstein* did not state that the officer found the DVDs "incident to [appellant's] arrest."

[4] Thus, to be clear, I do not disagree that in some cases, the late disclosure of information material to the outcome of a pretrial suppression hearing can violate *Brady*. (I acknowledge that possibility even though, as some other courts have observed, "[s]uppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or punishment. . . .'" *United States v. Bullock*, 130 F. App'x 706, 723 (6th Cir. 2005) (quoting *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999)).) I would agree, for example, that the untimely disclosure of information that would impeach a government suppression-hearing witness is covered by *Brady*.

[5] *Cf. United States v. Gamez-Orduno*, 235 F.3d 453, 461-62 (9th Cir. 2000) ("[T]he government had argued, in its briefs and orally at the suppression hearing, that appellants lacked Fourth Amendment standing because they were trespassers in the trailer with no connection to the Carrillos. . . . By withholding the report while making factual representations inconsistent with it, the government violated due process by 'depriving [appellants] of liberty through a deliberate deception of court and jury . . .[which is] as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.'" (quoting *Brady*, 373

claim, and that is not the basis for the majority opinion's finding of a *Brady* violation.

Because the information about the "true basis" for the search of the backpack and box of DVDs was neither exculpatory nor impeaching, it was not covered by *Brady*.[6] The majority opinion avoids this conclusion by emphasizing the language, used in *Brady* and its progeny, that it is the "suppression by the prosecution of *evidence favorable to an accused*" that violates due process, *Brady*, 373 U.S. at 87-88 (italics added), and by arguing that it is "favorable to the accused" to know of information that would support a motion to suppress evidence

---

U.S. at 86); *United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993) ("[T]he due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant.").

[6] To the extent that the information at issue can be characterized as information that the DVDs were not on appellant's person, there is another reason why the delayed information was not a *Brady* violation: "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts . . . ." *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (internal quotation marks omitted); *Henson v. United States*, 399 A.2d 16, 19 (D.C. 1979) (no *Brady* violation in failure to disclose a transcript of the defendant's parole hearing because the defendant was present at the parole hearing and was fully aware of the existence and contents of the testimony given there); *Smith v. United States*, 363 A.2d 667, 668 (D.C. 1976) ("[T]he rule of *Brady* applies" where there is "the discovery after trial of information which had been known to the prosecution but unknown to the defense.").

on Fourth Amendment grounds. However, the "favorable to the accused" evidence the Supreme Court had in mind was evidence "which, if made available, would tend to exculpate [the defendant] or reduce the penalty . . . ." *Id.*; *see also Bagley*, 473 U.S. at 676-77 (rejecting any distinction between impeachment evidence and exculpatory evidence, because the reliability of a given witness may be determinative of guilt or innocence); *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976) ("It has been argued that the [*Brady* materiality] standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence. . . . Such a standard would be unacceptable . . . [because it] would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense.").[7]

---

[7] *See also DeLuca v. State*, 553 A.2d 730, 746 (Md. Ct. Spec. App. 1989) (observing that the Supreme Court's opinion in *Agurs* "was a full-fledged explication of *Brady*," which "reaffirmed that 'exculpatory' means 'exculpatory' as it referred to the subject matter of *Brady*'s duty to disclose as 'evidence highly probative of innocence.'"); *Downs v. Fla. Dep't of Corr*., 738 F.3d 240, 260 (11th Cir. 2013) ("[T]he existence of informants . . . constitutes *Brady* material only when the informant . . . would offer or lead to exculpatory or impeaching information favorable to the defendant."); *United States v. Perdue*, 8 F.3d 1455, 1461 (10th Cir. 1993) (explaining that the *Brady* requirement that the prosecution "disclose evidence favorable to the accused" was not implicated because, even though the withheld evidence might have assisted the defense, it was neither impeachment nor exculpatory evidence and thus was not "favorable" to the

The majority opinion also relies on this court's statement that an "eminently sensible" formulation of the government's *Brady* obligation is that it reaches any evidence "that the defense would want to know about . . . ." *Miller v. United States*, 14 A.3d at 1110 (quoting *Leka v. Portuondo*, 257 F.3d 89, 99 (2d Cir. 2001)); *see also Mackabee v. United States*, 29 A.3d 952, 962 (D.C. 2011). However, as used in all those cases, that formulation was meant to guide the government with respect to whether the disclosure obligation applies to evidence that is only arguably exculpatory. *See Miller*, 14 A.3d at 1110 (delayed disclosure of "testimony, given shortly after the crime was committed, to the effect that the gunman used his left hand to shoot the victim (in a case in which the defendant is

defendant); *Barton*, 995 F.2d at 934 (rejecting as "without merit" the argument that because the introduction of certain inculpatory evidence (an odorless marijuana plant found in the defendant's home) at a suppression hearing "would have resulted in the exclusion of incriminating evidence" (because it would have undermined police officer's sworn statement in a warrant affidavit that they smelled marijuana in the defendant's house) the evidence was thereby exculpatory; and stating that "[w]hile it is true that resolution of a suppression motion can and often does determine the outcome of the case, . . . the successful suppression of incriminating evidence is unrelated to the actual culpability of an accused. . . . Because the marijuana evidence was inculpatory, the failure to preserve this evidence does not amount to the destruction of exculpatory evidence in violation of *Brady* and its progeny."); *United States v. Kidding*, 560 F.2d 1303, 1313 (7th Cir. 1977) ("Defendant has not cited to us, nor have we found, any case which recognizes a defendant's due process right to inculpatory evidence in the possession of the government.").

right-handed) . . . ."); *Leka*, 257 F.3d at 98 (delayed disclosure of the "true nature" of the testimony of an additional eyewitness to the murder, whose testimony cast doubt on the trial testimony presented by other eyewitnesses); *Mackabee*, 29 A.3d at 962 (failure to disclose fact that an eyewitness "pointed to two other individuals in the photographs, saying that the shooter 'sort of looks like one of these guys,' while not pointing to appellant."). None of the cases suggests that information or evidence is covered by *Brady* if it is neither exculpatory or impeaching but simply is information or evidence that the defense would like to know for some strategic advantage.[8]

According to the majority opinion, this court has "repeatedly held that information tending to show the inadmissibility of government evidence is 'favorable' evidence that must be disclosed under *Brady*." That characterization is at best misleading. The point to be noticed is that the cases that the majority opinion cites in support of that proposition all involved the untimely disclosure of evidence that was potentially impeaching of a government witness. In *Gaither v.*

---

[8] *Cf. Weatherford v. Bursey*, 429 U.S. 545, 559-60 (1977) ("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; . . . . *Brady* is not implicated here where the only claim is that the State should have revealed that [it] would present the eyewitness testimony of a particular agent against the defendant at trial.").

*United States*, 759 A.2d 655 (D.C. 2000), *amended by* 816 A.2d 791 (D.C. 2003), we remanded for the trial court to consider the appellant's claim that "the government withheld evidence that materially impeached Fennel, the government's principal witness." *Id.* at 662. In *Smith v. United States*, 666 A.2d 1216 (D.C. 1995), the *Brady* claim was based on the "revelation [for the first time] at trial, that the complainant/declarant purposefully misrepresented during [a 911] call that the robber had a gun in his face . . . ." *Id.* at 1224. We held that this was *Brady* material, explaining that "[p]rior inconsistent statements of a key government witness may be sufficiently material to guilt as to constitute *Brady* material." *Id.* at 1224-25. In *James v. United States*, 580 A.2d 636 (D.C. 1990), the witness's statement to police that was disclosed only on the fifth day of trial was one that, in addition to bearing on whether another statement by the witness was an excited utterance, "was used by appellant's counsel during cross-examination . . . and in closing argument in an attempt to impeach the credibility and the motives of" two government witnesses. *Id.* at 641. And in *Porter v. United States*, 7 A.3d 1021 (D.C. 2010), where the claim was that the government violated *Brady* by failing to turn over information about facts bearing on the potential bias of a confidential informant (information that the defense argued could have shown that the police lacked probable cause to arrest and search the defendant), we noted first that "*Brady* material can include both exculpatory and impeachment evidence" but

stated repeatedly that the information "could not have been used to impeach the informant because he did not testify[,]" and then merely made the "[f]urther" observation that the information could not have been used to call into question the existence of probable cause because the information did not exist at the time the officers made their decision to arrest and search the defendant. *Id.* at 1025-26. In each of these cases, the fact that the withheld information had a bearing on the admissibility of certain evidence, or that it bore on whether police had probable cause, may have been relevant to whether the withheld information was material, but none of the cases suggests that information that is neither exculpatory nor impeaching is covered by *Brady*.[9]

I recognize that the government did little to develop the argument that the information at issue here was "not plainly exculpatory or impeaching"; indeed, the government made that assertion only in a heading in its brief. However, as I have

---

[9] The federal circuit opinions cited in the majority opinion also involved the untimely disclosure of information that could have been used to impeach the testimony of a government witness. In *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992), the *Brady* violation was the government's failure to disclose written witness statements, a lineup report, police reports and notes from a radio call that could have impeached a police sergeant's testimony at a suppression hearing. In *Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000), the withheld information "would have provided the defense with the opportunity to call into question whether Ware had a motive for his testimony regarding the initiation of the interrogation resulting in Petitioner's confession."

previously expressed, my understanding of our responsibility as an appellate court is that we are to decide cases in accordance with law, a responsibility that is "not to be diluted by counsel's oversights" and that on occasion obligates us to "raise *sua sponte* an argument on appeal that the government has failed to raise." *Tuckson v. United States*, 77 A.3d 357, 375-77 (D.C. 2013) (Thompson, J., dissenting) (internal quotation marks and alterations omitted).

My colleagues in the majority observe that a rule prohibiting the government from suppressing information of the type involved here "would impose little if any additional burden on prosecutors and police beyond the obligations that [some court's] rules and professional standards already impose." They cite the section of the United States Attorneys' Manual that requires disclosure of information that "might have a significant bearing on the admissibility of prosecution evidence," USAM § 9-5.001.C.2,[10] and local rules 116.1 (c)(1)(B) and 116.2 (a)(2) of the United States District Court for the District of Massachusetts (requiring, respectively, that the government provide a written description of an incriminating warrantless search and disclose information that "tends to . . . cast doubt on the admissibility of evidence that the government anticipates using in its case-in-

---

[10] Note that this language is included in a section entitled "Additional *impeachment* information that must be disclosed." USAM § 9-5.001 (C) (italics added).

chief. . . .").[11]  *See* L.R. 116.1 (c) (1) (B); L.R. 116.2 (a) (2).  I have no quarrel with these rules as a matter of policy, but I note that they have been the subject of much debate and discussion (focused on whether the Federal Rules of Criminal Procedure should be amended to incorporate the broad discovery obligations they describe).[12]  I am not persuaded that we should take sides in this debate about the appropriate scope of discovery through a novel extension of our *Brady* jurisprudence (i.e., by declaring that, as a matter of constitutional due process, the prosecution is obligated to ferret out and disclose any information that could support a Fourth Amendment suppression motion).[13]  We should particularly avoid

---

[11]  The Massachusetts District Court rules have been called "the most extensive local criminal discovery rules in the nation."  *United States v. Jones*, 620 F. Supp. 2d 163, 170 (D. Mass. 2009) (quoting an American College of Trial Lawyers report).

[12]  *See Jones*, 620 F. Supp. 2d at 170-73.

[13]  The driving force behind *Brady* is that "absence of the withheld evidence may result in the conviction of an innocent defendant . . . ."  *Connick v. Thompson*, 131 S. Ct. 1350, 1385 (2011); *see also United States v. Brown*, No. 13-4654, 2014 U.S. App. LEXIS 11034, at *7 (4th Cir. June 13, 2014) ("'The *Brady* right . . . exists to . . . minimize the chance that an innocent person would be found guilty.'").  That concern is not implicated when the undisclosed information is information that would enable a defendant to obtain the suppression of inculpatory evidence and thereby avoid conviction.  I note that I have not been able to find a single other opinion that squarely holds that the government has a duty under *Brady* to disclose non-exculpatory, non-impeaching information on the sole basis that it could provide a basis for a suppression motion.  Perhaps that is in part because — unlike the due process requirement that the prosecution disclose exculpatory evidence and not rely on perjured testimony — the exclusionary rule, whose application suppression motions seek, is not a constitutional requirement.

that course in this case, where it is far from clear that trial counsel raised a *Brady* claim,[14] where the record suggests no reason why counsel could not have ascertained the pertinent information (that the DVDs were not on appellant's person or within his reach) through some very basic questioning of her client, and where we have an alternative basis for affording appellant relief.

---

*United States v. Leon*, 468 U.S. 897, 905-06 (1984) (explaining that the exclusionary rule is not required by the Fourth or Fifth Amendments).

[14] As the majority opinion acknowledges, counsel never mentioned *Brady* by name. The record — specifically, counsel's statements that "we really don't know who the tip is from" and that a continuance of the trial would give her "time to investigate this source" — suggests that she may instead have been expressing concern that she had not had an opportunity to file a motion requesting disclosure of the identity of the confidential informant to pursue the possibility that the informant might give testimony undercutting the evidence that appellant constructively possessed the box of DVDs. *Cf. Goodson v. United States*, 760 A.2d 551, 552-53 (D.C. 2000).